**Case No. 14-15494**

—————————————————————————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

—————————————————————————————

MARIA GARCIA, DAVID GARCIA, and ANGELICA GUZMAN,

Plaintiffs-Appellants,

v.

GINA MCCARTHY, in her official capacity as Administrator of the U.S.
Environmental Protection Agency, JARED BLUMENFELD, in his official
capacity as Regional Administrator of Region IX of the U.S. Environmental
Protection Agency, and U.S. ENVIRONMENTAL PROTECTION AGENCY,

Defendants-Appellees.

—————————————————————————————

On Appeal from the United States District Court for the
Northern District of California
Case No. 13-cv-03939-WHO
Hon. William H. Orrick

—————————————————————————————

**PLAINTIFFS-APPELLANTS' OPENING BRIEF**

BRENT J. NEWELL
MADELINE STANO
CENTER ON RACE, POVERTY & THE
ENVIRONMENT
1999 Harrison Street, Suite 650
Oakland, CA 94612
Telephone: (415) 346-4179
Facsimile: (415) 346-8723
bnewell@crpe-ej.org
mstano@crpe-ej.org

MICHAEL MEUTER
CALIFORNIA RURAL LEGAL
ASSISTANCE, INC.
3 Williams Road
Salinas, CA 93905
Telephone: (415) 346-4179
Facsimile: (415) 346-8723
mmeuter@crla.org

*Attorneys for Plaintiffs-Appellants*
*(additional counsel listed on signature page)*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... iii

STATEMENT OF JURISDICTION ..............................................................1

    Statutory Basis of Subject Matter Jurisdiction of the District Court .........1

    Jurisdiction of the Court of Appeals and Timeliness of this Appeal .........1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................1

ADDENDUM ............................................................................................2

STATEMENT OF THE CASE ......................................................................2

    Nature of the Case ............................................................................2

    Background of Title VI of the Civil Rights Act ........................................4

STATEMENT OF FACTS AND PROCEDURAL HISTORY ...............................8

    *Angelita C*. Title VI Civil Rights Complaint and Proceedings
    Below ............................................................................................8

    Disparate Impacts of Pesticide Use in California ................................15

    EPA's History of Enforcing its Title VI Implementing
    Regulations ....................................................................................19

SUMMARY OF THE ARGUMENT ..............................................................22

ARGUMENT ...........................................................................................23

I.     STANDARD OF REVIEW ..................................................................23

II.    EPA ACTIONS UNDER TITLE VI ARE SUBJECT TO JUDICIAL
      REVIEW ..........................................................................................24

    A. Title VI and EPA's Regulations Govern EPA's Enforcement and
       Provide Law to Apply ......................................................................25

1. The Administrative Procedure Act subjects EPA's enforcement authority to a strong presumption towards judicial review .................................................................................... 27

2. Title VI and EPA's regulations limit EPA's discretion .......... 30

3. EPA's actions resolving *Angelita C.* are subject to judicial review as part of general policy abdicating its statutory responsibilities ........................................................................ 39

B. The Civil Rights Act Authorizes Judicial Review ............................ 40

III. CALIFORNIA PESTICIDE LAWS DO NOT DISPLACE JUDICIAL REVIEW UNDER THE ADMINISTRATIVE PROCEDURE ACT ...... 44

A. Only Congress May Provide Adequate Alternative Remedies .......... 45

B. California Pesticide Laws do not Remedy Racial Discrimination ...... 47

IV. STANDING ........................................................................................ 50

V. CONCLUSION ................................................................................. 53

STATEMENT OF RELATED CASES ................................................................ 54

CERTIFICATION OF COMPLIANCE ................................................................ 55

ADDENDUM

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir. 1973)....................................*passim*

*Alexander v. Sandoval*, 532 U.S. 275 (2001)......................................................*passim*

*Baltimore Gas & Elec. Co. v. F.E.R.C.*, 252 F.3d 456 (D.C. Cir. 2001)................29

*Bowen v. Massachusetts*, 487 U.S. 879 (1988).............................................45, 46, 48

*Brem-Air Disposal v. Cohen*, 156 F.3d 1002, 1004 (9th Cir. 1998)......................46

*Budget Rent-A-Car v. Higashiguchi*, 109 F.3d 1471 (9th Cir. 1997).....................23

*Carson Harbor Village, Ltd. v. City of Carson*, 353 F.3d 824 (9th Cir. 2004).......23

*Chang v. USA*, 327 F.3d 911 (9th Cir. 2003)...........................................................48

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971) .................*passim*

*Coker v. Sullivan*, 902 F.2d 84 (D.C. Cir. 1990) .....................................................46

*Connecticut National Bank v. Germain*, 503 U.S. 249 (1992)................................40

*Drakes Bay Oyster Co. v. Jewell,* 729 F.3d 967 (9th Cir. Sept. 3, 2013)................28

*Friends of the Earth v. Laidlaw,* 528 U.S. 167 (2000) ............................................52

*Greater Los Angeles Council on Deafness, Inc. v. Baldridge*
    827 F.2d 1353 (9th Cir. 1987) .......................................................................31

*Georgia State Conference of Branches of NAACP v. Georgia*
    775 F.2d 1403 (11th Cir. 1985) .....................................................................38

*Guardians Association v. Civil Service Commission*, 463 U.S. 582 (1983) ...........33

*Hardy v. Leonard*, 377 F.Supp. 831 (N.D. Cal. 1974) ...........................................43

*Heckler v. Chaney*, 470 U.S. 821 (1985) ...........................................................*passim*

*Kang v. U. Lim Am., Inc.*, 296 F.3d 810 (9th Cir. 2002) ........................................41

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005)....................................................24

*Kungys v. United States*, 485 U.S. 759 (1988) ........................................................41

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...............................................52

*Marlow v. U.S. Department of Education*, 820 F.2d 581 (2d Cir. 1987) ...............41

*National Association of Home Builders v. Defenders of Wildlife*
    551 U.S. 644 (2007)...................................................................................35

*Powell v. Ridge*, 189 F.3d 387 (3rd Cir. 1999)......................................................38

*Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978)...........................................32

*Rosemere Neighborhood Association v. EPA*
    581 F.3d 1169 (9th Cir. 2009)............................................................20, 39

*Sandoval v. Hagan*, 197 F.3d 484 (11th Cir. 1999)..................................................38

*South Camden Citizens in Action v. New Jersey Department of Environmental*
    *Protection*, 145 F.Supp.2d 446 (D.N.J. 2001) .....................................38, 49

*Spencer Enterprises, Inc., v. United States,* 345 F.3d 683 (9th Cir. 2003) ............29

*Summers v. Earth Island Institute,* 555 U.S. 488 (2009)........................................51

*Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205 (1972) .............................42

*Tucson Airport Authority v. General Dynamics Corp.*
    136 F.3d 641 (9th Cir. 1998) ........................................................................48

*Turtle Island Restoration Network v. United States Department of State*
    673 F.3d 914 (9th Cir. 2012).....................................................................51

*United States v. Carpenter*, 526 F.3d 1237 (9th Cir. 2008)............................*passim*

FEDERAL STATUTES

5 U.S.C. § 701 ..........................................................................................................40

5 U.S.C. § 704....................................................................................................1, 44, 45

28 U.S.C. § 1291 ..........................................................................................................1

28 U.S.C. § 1331 ................................................................1

28 U.S.C. § 1346 ................................................................1

28 U.S.C. § 1391(e) ............................................................1

42 U.S.C. § 1983 ..............................................................46

42 U.S.C. § 2000d ........................................................*passim*

42 U.S.C. § 2000d-1 ......................................................*passim*

42 U.S.C. § 2000d-2 ......................................................*passim*

## FEDERAL REGULATIONS

40 C.F.R. § 7.30 ................................................................5

40 C.F.R. § 7.35 ................................................................5

40 C.F.R. § 7.35(b) ......................................................passim

40 C.F.R. § 7.115 ..............................................................6

40 C.F.R. § 7.115(c) ..........................................................7

40 C.F.R. §7.115(c)(1) ......................................................11

40 C.F.R. §7.115(c)(1)(ii) ..................................................37

40 C.F.R. § 7.115(d) ..........................................................7

40 C.F.R. § 7.115(d)(2) ......................................................7

40 C.F.R. § 7.115(e) ......................................................7, 36

40 C.F.R. § 7.115(f) ..........................................................7

40 C.F.R. § 7.120 ..............................................................................6, 35, 36

40 C.F.R. § 7.120(b)(1) ................................................................................36

40 C.F.R. § 7.120(b)(2) ................................................................................36

40 C.F.R. § 7.120(c) ......................................................................................6

40 C.F.R. § 7.120(d) ......................................................................................6

40 C.F.R. § 7.120(d)(1)(i) ..............................................................................6

40 C.F.R. § 7.120(d)(1)(ii) .............................................................................6

40 C.F.R. § 7.120(d)(1)(iii) ............................................................................6

40 C.F.R. § 7.120(g) .....................................................................................37

40 C.F.R. § 7.130(a) .....................................................................................37

40 C.F.R. § 7.130(b) .....................................................................................36

## COURT RULES

FED. R. CIV. P. 12(b)(1) ...........................................................................4, 15, 23

FED. R. APP. P. 4(a)(1)(B) ..............................................................................1

## FEDERAL REGISTER NOTICES

65 Fed. Reg. 39650 (June 27, 2000) ...........................................................20

69 Fed. Reg. 76982 (Dec. 23, 2004) ...........................................................16

## STATE STATUTES

Cal. Food and Agric. Code § 14009 ........................................................50

Cal. Food and Agric. Code§ 14009(d)...........................................47, 48

Cal. Food and Agric. Code§ 14009(g)...........................................47, 48

## STATEMENT OF JURISDICTION

**Statutory Basis of Subject Matter Jurisdiction of the District Court.**

The District Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1346 because the action involves the United States as a defendant and arises under the laws of the United States, including the Administrative Procedure Act (APA). 5 U.S.C. §§ 704 *et seq.* Venue was properly vested in the District Court pursuant to 28 U.S.C. § 1391(e) because a substantial portion of the cause of action arose within the Northern District of California.

**Jurisdiction of the Court of Appeals and Timeliness of this Appeal.**

On January 16, 2014, the District Court granted Defendant's Motion to Dismiss. ER 1:2-34.[1] On February 7, 2014, the District Court entered judgment. ER 1:1. On March 14, 2014, Garcia filed the Notice of Appeal. ER 2:35. The Notice of Appeal was timely filed pursuant to FED. R. APP. P. 4(a)(1)(B). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    Whether the District Court erred in ruling that EPA's investigation, settlement, and dismissal of the *Angelita C.* administrative civil rights racial

---

[1] Garcia cites to the Excerpts of Record ("ER") as [volume]:[page number].

discrimination complaint were committed to agency discretion by law and precluded from judicial review under the Administrative Procedure Act.

2.    Whether the District Court erred in ruling that California pesticide laws provided an adequate remedy, precluding judicial review under the Administrative Procedure Act.

## ADDENDUM

Pursuant to Circuit Rule 28.2-7, Garcia includes an Addendum bound with this brief.

## STATEMENT OF THE CASE

**Nature of the Case.**

This action arises from the failure of Defendants-Appellees Gina McCarthy, Jared Blumenfeld, and the U.S. Environmental Protection Agency (collectively "EPA") to investigate and redress racial discrimination prohibited by Title VI of the Civil Rights Act of 1964. EPA arbitrarily and capriciously investigated, settled, and dismissed the administrative civil rights complaint – *Angelita C. v. California Department of Pesticide Regulation* – filed in 1999 by Plaintiffs-Appellants Maria Garcia, David Garcia, and Angelica Guzman (collectively "Garcia") without remedying the racially disparate impacts caused by the California Department of Pesticide Regulation ("CDPR") allowing pesticide use in California, which disproportionately affects schools with majority Latino

2

attendance. Moreover, EPA's investigation (finished in 2011) only analyzed the disparate impacts from methyl bromide use between 1996 and 2001 and ignored the post-2001 increasing use of other fumigants that replaced methyl bromide, a fumigant banned by the Montreal Protocol – an international treaty EPA administers – and phased out after 2001.

In 1999, Garcia along with other parents of Latino schoolchildren disparately exposed to pesticides filed *Angelita C.* with EPA alleging racially disparate impacts from harmful pesticide and fumigant exposures, including methyl bromide, a highly toxic fumigant. ER 2:41, 265 (Complaint ¶41). Twelve years later in 2011, EPA secretly issued its first ever preliminary finding under Title VI, agreeing with the complainants' allegations with respect to only methyl bromide. ER 2:257-258 (Complaint ¶5). Without informing Garcia or the other complainants, EPA entered into a voluntary compliance agreement with CDPR without ensuring that disparate impacts from pesticide use would stop. ER 2:257-8 (Complaint ¶¶2, 5-7). EPA found that methyl bromide use between 1995 and 2001 established a *prima facie* violation of Title VI of the Civil Rights Act, but the settlement provided no substantive protections from methyl bromide or the fumigants that replaced methyl bromide after 2001. ER 2:258 (Complaint ¶¶7-8).

On August 20, 2013, Garcia filed a complaint pleading two claims for relief: EPA arbitrarily and capriciously investigated, settled, and dismissed the *Angelita*

*C*. complaint in violation of the Administrative Procedure Act ("APA") and EPA violated Garcia's right to procedural due process guaranteed by the Fifth Amendment of the U.S. Constitution.[2]  ER 2:279-283.  EPA subsequently filed a Motion to Dismiss the APA claim, alleging the District Court lacked subject matter jurisdiction because EPA's investigation, settlement, and dismissal of the *Angelita C*. complaint were committed to agency discretion by law and that California pesticide law provided an adequate remedy, both of which precluded  judicial review.  ER 1:2-34.  The District Court granted EPA's motion with respect to both arguments, dismissed the APA claim, and this appeal followed.  *Id*.; ER 1:1.[3]

**Background on Title VI of the Civil Rights Act.**

Title VI of the Civil Rights Act protects individuals from racial discrimination by recipients of federal financial assistance.  42 U.S.C. § 2000d. Section 601 mandates that "[N]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the

---

[2] Garcia does not appeal the District Court's dismissal of the procedural due process claim.

[3] The District Court, in one sentence, concluded that EPA did not violate the APA. "Even if EPA's actions were reviewable, the Court finds that EPA did not act in a manner that was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" ER 1:19 (Order 18:20-22).  Before the District Court was a motion to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.  The parties had neither briefed, nor did the Court request the parties to brief, the merits and the Court did not have the administrative record before it. Accordingly, the Court erred when it concluded that the EPA did not violate the APA.

benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Id*.

Section 602 authorizes and directs each federal agency that provides federal financial assistance to any program or activity "to effectuate the provisions of section 601 with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." 42 U.S.C. § 2000d-1. Congress authorized agencies to ensure compliance with any requirement promulgated pursuant to section 602 by terminating federal funding or "by any other means authorized by law." *Id*. Congress limited agencies' enforcement authority by mandating that "no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means." *Id*.

Pursuant to section 602, the EPA promulgated regulations prohibiting EPA funding recipients from engaging in racial discrimination. *See* 40 C.F.R. §§ 7.30 and 7.35. The regulations expressly prohibit programs or activities that have a disparate impact.

> A recipient shall not use criteria or methods of administering its program or activity which have the effect of subjecting individuals to discrimination because of their race, color, national origin, or sex, or have the effect of defeating or substantially impairing accomplishment

5

of the objectives of the program or activity with respect to individuals
of a particular race, color, national origin, or sex.

40 C.F.R. § 7.35(b).

The EPA, through the Office of Civil Rights ("OCR"), is responsible for

investigating complaints against EPA funding recipients. 40 C.F.R. §§ 7.115 and

7.120. Once a complainant files a complaint with EPA, the OCR has five (5)

calendar days to notify the complainant and the recipient of the OCR's receipt of

the complaint. 40 C.F.R. § 7.120(c). After acknowledging receipt of a complaint,

the OCR must immediately initiate complaint processing procedures. 40 C.F.R. §

7.120(d). Within twenty (20) days after the OCR acknowledges the complaint, the

OCR will review the complaint for acceptance, rejection, or referral to the

appropriate Federal agency. 40 C.F.R. § 7.120(d)(1)(i). "The OCR shall promptly

investigate all complaints filed under this section unless the complainant and the

party complained against agree to a delay pending settlement negotiations." 40

C.F.R. § 7.120.

If the complaint is accepted, the OCR will notify the complainant, the EPA

Award Official, and the recipient of federal financial assistance. 40 C.F.R. §

7.120(d)(1)(ii). The recipient then has the opportunity within thirty (30) days to

submit a response to the OCR addressing the allegations in the complaint. 40

C.F.R. § 7.120(d)(1)(iii). Within 180 days of the start of the complaint

investigation, OCR will notify the recipient in writing by certified mail, return

receipt requested, of preliminary findings, recommendations for voluntary compliance, and the recipient's right to engage in voluntary compliance negotiations where appropriate. 40 C.F.R. § 7.115(c).

After receiving the notice of OCR's preliminary finding of noncompliance, the recipient may (1) agree to the OCR's recommendations; or (2) submit a written response sufficient to demonstrate that the preliminary findings are incorrect, or that the recipient may achieve compliance through steps other than those recommended by OCR. 40 C.F.R. § 7.115(d). If the recipient does not take one of these actions within fifty (50) calendar days after receiving this preliminary notice, the OCR shall, within fourteen (14) calendar days, send a formal written determination of noncompliance to the recipient and copies to the Award Official and the Attorney General. 40 C.F.R. § 7.115(d)(2). If the recipient does not come into voluntary compliance within ten (10) days after the formal written determination of noncompliance, then EPA shall initiate proceedings to secure compliance. 40 C.F.R. § 7.115(e). "All agreements to come into voluntary compliance" must be in writing and must "set forth the specific steps the recipient has agreed to take." 40 C.F.R. § 7.115(f).

Section 603 provides for judicial review of agency actions. Any action taken pursuant to section 602 is subject to judicial review as provided by law. 42 U.S.C. § 2000d-2. Section 602 further allows that "any person aggrieved may

obtain judicial review" of an agency action "to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 602[.]" 42 U.S.C. § 2000d-2.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### *Angelita C*. Title VI Civil Rights Complaint and Proceedings Below.

Garcia are parents of children who attended, currently attend, or will attend schools in Oxnard, California (Ventura County) and who were, are, or will be exposed to dangerous levels of toxic pesticides and fumigants. ER 2:260 (Complaint ¶19).

On June 30, 1999, appellant Maria Garcia, on behalf of herself and her then minor son David Garcia, filed *Angelita C. v. California Department of Pesticide Regulation*, EPA File No. 16R-99-R9, with EPA alleging CDPR violated Title VI of the Civil Rights Act by authorizing pesticide use which subjected Latino schoolchildren in California to disparate impacts from harmful and discriminatory exposures to toxic pesticides and fumigants, including methyl bromide. ER 2:41. "To demonstrate this disproportionate impact, this complaint focuses on methyl bromide, due to its particularly deadly characteristics, as an example of overall use of and exposure to highly toxic pesticides in the state." ER 2:42. Despite the Montreal Protocol, which bans the use of methyl bromide, CDPR has re-registered

and permitted the use of methyl bromide in addition to a host of other dangerous fumigants every year since 1999. ER 2:265 (Complaint ¶41).

David Garcia was fourteen years old when *Angelita C.* was filed in 1999 and a student at Rio Mesa High School in Oxnard, California. ER 2:47, 261 (Complaint ¶21). By the time EPA had resolved *Angelita C.* and David Garcia sought judicial review of EPA's action, Mr. Garcia had graduated from Rio Mesa and become a parent to two children, one and three years old. Mr. Garcia and his children live in the Rio School District and the Oxnard Union School District and will attend Rio Lindo Elementary School, Rio del Valle Middle School, and Rio Mesa High School. ER 2:261 (Complaint ¶21).

Angelica Guzman is Maria Garcia's daughter who has two children and lives in the Rio School District and Oxnard Union School District. ER 2:261 (Complaint ¶22). Her children attend Rio Lindo Elementary School, and will attend Rio del Valle Middle School and Rio Mesa High School. *Id.*

Human exposure to high concentrations of methyl bromide can result in complete central nervous system and respiratory system failure in addition to causing severe harm to the lungs, eyes and skin. ER 2:265 (Complaint ¶42). Chronic, low-level exposure is associated with peripheral neuropathies, impaired gait, cognitive and behavioral changes, and liver and kidney dysfunction. *Id.* The acute effects of methyl bromide exposure include headaches, drowsiness, lethargy

9

nausea, vomiting, dizziness, blurred vision, twitching and convulsions, seizures, psychosis and, at sufficiently high exposures, death. *Id*. These effects may occur after a single poisoning incident. *Id*. Methyl bromide causes "biologically significant" developmental birth defects including the absence of gall bladders, fused *sternebrae* (spine), and dangerously decreased fetal weight. ER 2:265-6 (Complaint ¶42). California includes methyl bromide on the Proposition 65 list of developmental toxicants. *Id*. Children are especially vulnerable to the effects of methyl bromide because of both greater exposure to pesticides and greater physiological susceptibility. *Id*.

On December 11, 2001, 895 days after Maria Garcia and the other complainants filed *Angelita C.*, EPA accepted the complaint for investigation. ER 2:266 (Complaint ¶43). On September 10, 2002, EPA staff met exclusively with CDPR senior management. ER 2:266 (Complaint ¶44). At this meeting, CDPR indicated its intent to continue authorizing the use of methyl bromide, arguing their permitting processes were adequate and did not require additional measures to address risks posed by methyl bromide application. ER 2:266 (Complaint ¶44). EPA did not notify complainants of, or invite them to, this or any subsequent investigative meeting. *Id*.

Before issuing its preliminary finding of a *prima facie* violation of Title VI, EPA conducted at least one additional phone call with EPA staff and CDPR senior

management.  ER 2:266 (Complaint ¶45).  During this call CDPR reiterated its position that it was appropriately mitigating the risks posed by methyl bromide and in compliance with governing laws.  *Id*.

On April 22, 2011, almost *twelve years* after the parents filed *Angelita C.* to protect their children from racially disparate impacts from pesticide exposure, EPA issued its preliminary finding of discrimination and recommendations for voluntary compliance, but kept those findings secret and did not inform the complainants or the general public.  ER 2:266 (Complaint ¶46).[4]

EPA found "sufficient evidence to make a preliminary finding of a *prima facie* violation of Title VI as a result of the disparate impact upon Latino schoolchildren in California from the application of methyl bromide between 1995 and 2001."  ER 2:266-7 (Complaint ¶47).  EPA did not analyze pesticide or fumigant exposure after 2001 or the disparate impacts from any pesticides or fumigants other than methyl bromide.  *Id*.; ER 2:143-241.

EPA examined the estimated number and demographic composition of children from each school listed in the original complaint and compared those with the "comparison group" of majority non-Latino schools in California.  ER 2:267

---

[4] 40 C.F.R. § 7.115(c)(1) imposes a duty on EPA to issue the preliminary finding within 180 days of accepting the complaint for investigation.  Between December 11, 2001 and April 22, 2011, EPA used 3,419 days for its investigation.  ER 2:266 (Complaint ¶46 fn. 17).  During this time, the Montreal Protocol banned the use of methyl bromide and other fumigants replaced methyl bromide.  ER 2:274 (Complaint ¶¶76-77).

(Complaint ¶48). The EPA's model evaluated data from over 8,000 California public schools.  *Id*.  EPA compared health-based concentration thresholds derived by EPA's Office of Pesticide Programs ("OPP") in conjunction with its predicted concentration levels of methyl bromide derived from CDPR's Pesticide Use Reports (PUR) near schools in order to identify which, if any, had unhealthy exposures from methyl bromide.  *Id*.

EPA found that Latino schoolchildren were disparately exposed to both short-term acute (1-30 day period) and long-term chronic (180 days to lifetime) levels of methyl bromide above EPA's health thresholds of concern.  ER 2:244, 267 (Complaint ¶49).  EPA found Rio Mesa High School exceeded all twelve health-based exposure scenarios.  ER 2:197; 2:261 (Complaint ¶24).  EPA additionally found Rio Lindo Elementary School and Rio Del Valle Middle School exceeded EPA's national exposure benchmarks for methyl bromide for both intermediate-term exposures and long-term exposures.  ER 2:262 (Complaint ¶27).

As required by 40 C.F.R. § 7.115(c)(ii), the Preliminary Finding provided recommendations for CDPR to achieve voluntary compliance with Title VI.  EPA recommended additional ambient air monitoring to determine if CDPR was achieving protection on an ongoing basis; a data-call-in process with pesticide registrants in order to collect data from high-use areas; the promulgation of methods to ensure monitoring efforts will be complementary to confirm that long-

term exposure exceedances do not recur; and that CDPR develop an outreach component for its air monitoring network in order to communicate findings to communities burdened with exposure. ER 2:245; 2:267 (Complaint ¶50).

The Preliminary Finding suggested that CDPR achieve community-wide exposure reductions through the use of high-barrier virtually impermeable films ("VIF") and township caps on methyl bromide use. ER 2:245-246; 2:267 (Complaint ¶51). EPA also invited the technical staff of CDPR to discuss the investigation and to answer any technical questions. ER 2:246; 2:267-268 (Complaint ¶52). EPA asked CDPR to keep the settlement discussions confidential. "OCR would like to conduct these discussions confidentially and hopes that CDPR will also view them in the same way." *Id*. EPA did not invite complainants to participate in these discussions or to view any underlying investigative documents. *Id*.

After sending the Preliminary Finding to CDPR, EPA conducted an unknown number of settlement discussion sessions with CDPR between April 22, 2011 and August 24, 2011. ER 2:268 (Complaint ¶53). Neither CDPR nor EPA notified complainants that these negotiations were taking place nor did they invite them to participate. *Id*.

On August 24, 2011, EPA executed a voluntary compliance agreement ("settlement agreement") with CDPR. ER 2:248-255; 2:268 (Complaint ¶54). The

*Angelita C.* complainants were not parties to the settlement. *Id.* The settlement does not limit or alter the current registration or the use of methyl bromide, its replacements, or other hazardous pesticides near majority Latino public schools in California. ER 2:248-255, 2:268 (Complaint ¶55). The settlement differed from EPA's recommendations and only required CDPR to (1) continue pesticide ambient air monitoring in Salinas through 2013; (2) request the California Air Resources Board (ARB) to continue methyl bromide monitoring in Oxnard and Santa Maria, which had been set to expire during 2011, for an additional two years; (3) request ARB to conduct monitoring in the Watsonville area in township 12S 2E; (4) submit an annual report of monitoring results to EPA and environmental justice and air monitoring listserves; and (5) continue its education and outreach efforts to "the Latino community" by providing three outreach events per year, distributing written materials related to pesticide exposure, and paying for one public service announcement on Spanish-language radio stations, all within each of the five counties with the highest methyl bromide levels. ER 2:251-253 (Settlement Agreement ¶¶15-16), 2:268 (Complaint ¶56).

On August 24, 2011, EPA informed the *Angelita C.* complainants of the preliminary finding, the settlement agreement, and EPA's dismissal of *Angelita C.* ER 2:269 (Complaint ¶59). Over the next eight months, counsel for Garcia met with former EPA Administrator Lisa P. Jackson and California Environmental

Protection Agency Secretary Matthew Rodriquez in an effort to re-open the settlement agreement to include the complainants. ER 2:270-1 (Complaint ¶¶61-67). Even though Secretary Rodriquez was "willing to participate in discussions of potential modifications to the settlement" and discuss improving the credibility of the Title VI complaint resolution process, EPA ultimately refused. ER 2:271 (Complaint ¶¶66-67).

On August 23, 2013, Garcia filed this action and pleaded two claims for relief: EPA arbitrarily and capriciously investigated, settled, and dismissed the *Angelita C.* complaint in violation of the Administrative Procedure Act and EPA violated Garcia's right to procedural due process guaranteed by the Fifth Amendment of the U.S. Constitution. ER 2:279-283, 289. On October 7, 2013, Garcia filed a First Amended Complaint. ER 2:256.

On November 20, 2013, EPA filed a Motion to Dismiss. ER 2:291. With respect to the APA claims, EPA argued for dismissal pursuant to FED. R. CIV. P. 12(b)(1). ER 1:9-19 (Order Granting Motion to Dismiss ("Order") at 8:8-18). On January 16, 2014, the District Court granted EPA's Motion to Dismiss. ER 1:2. On February 7, 2014, the District Court entered judgment. ER 1:1.

**Disparate Impacts of Pesticide Use in California.**

Between 1999, when the complainants filed *Angelita C.*, and 2013, when Garcia filed this action, the implementation of the international Montreal Protocol

on Substances that Deplete the Ozone Layer altered the types of fumigants used as soil treatments, including methyl bromide. ER 2:274 (Complaint ¶76). Since 2004, critical use exemptions (CUEs) for methyl bromide use have been permitted under Section 604(d) of the Clean Air Act and the Montreal Protocol on Substances that Deplete the Ozone Layer. *Id*. On December 23, 2004, EPA published a rule establishing the framework for allocating critical use exemptions. *Id*.; 69 Fed. Reg. 76982 (Dec. 23, 2004).

Strawberry production has qualified for critical use exemptions every year since the Montreal Protocol. ER 2:274 (Complaint ¶77). Nevertheless, the amount of methyl bromide available to strawberry growers has declined substantially over time. *Id*. In place of methyl bromide, growers have utilized other available fumigants, in particular chloropicrin, 1,3-dichloropropene ( "Telone"), and metam salts. *Id*. These fumigants are toxic, used at high application amounts of 50-400 pounds per acre, and put students in close proximity to application sites at increased risk of negative health impacts. ER 2:277 (Complaint ¶80). These fumigants are carcinogenic, associated with respiratory and lung damage, neurotoxicants, correlated to mammary fibroadenomas and carcinomas in females and fibrosarcomas in both sexes. ER 2:277-278 (Complaint ¶¶81-83). As Figure 1 in the Complaint demonstrates, the overall mix of soil fumigants in California has

changed over time, but overall fumigant use, use patterns, and toxicity has not declined substantially.  ER 2:274 (Complaint ¶77 and Figure 1).

Rio Mesa High School, Rio del Valle Middle School, and Rio Lindo Elementary are also among the top 10% of zip code areas in California with the highest levels of pollution, with pesticides contributing 99.9% of the pollutants. ER 2:274 (Complaint ¶78).  An evaluation of soil fumigant use in the area near Rio Mesa High School indicates that use of these toxic chemicals is still very high, with six of the twelve square mile sections near the school and the section containing Rio Mesa High School in the 90th percentile of fumigant use in California.  ER 2:277 (Complaint ¶79); *see also* ER 2:275 (Complaint, Figure 2). As Figure 3 in the Complaint demonstrates, the pattern of declining methyl bromide use and replacement by chloropicrin, Telone, and metam salts also occurs in the area surrounding Rio Mesa High School and overall use or toxicity has not declined substantially.  ER 2:277 (Complaint ¶79); ER 2:275 (Complaint, Figure 3).

In April 2014, the California Environmental Health Tracking Program, a collaboration between the California Department of Public Health and the Public Health Institute evaluated the 2010 Pesticide Use Report data for pesticides and fumigants used near schools in California and found a racially discriminatory pattern of use.  The report AGRICULTURAL PESTICIDE USE NEAR PUBLIC SCHOOLS IN

CALIFORNIA (hereafter "Schools Report") assessed 2,511 public schools, attended by over 1.4 million students, in the 15 counties with the highest total reported agricultural pesticide use in 2010. Schools Report at vii, attached as Exhibit 1 to Plaintiffs-Appellants Motion to Take Judicial Notice, filed on May 1, 2015.

The Schools Report found that "Hispanics were the only racial/ethnic group whose representation increased as pesticide use increased." Schools Report at 38. While Hispanic children made up 54.1% of the population in the public schools in the 15 counties, they comprised 50.3% of the population in schools with no pesticide use within ¼ mile, 61.3% of the population in schools with any pesticide use within ¼ mile, and 67.7% of the population in schools in the highest quartile of pesticide use. *Id.* In the 15 counties, Hispanic children were 46% more likely than White children to attend schools with any pesticides of concern applied nearby and 91% more likely than White children to attend schools in the highest quartile of pesticide use. *Id.*

The Schools Report ranked the fumigants chloropicrin, 1,3-dichloropropene ("Telone"), methyl bromide, and metam-sodium (metam salts) as the most applied pesticides within a ¼ mile of a public school in California. *Id.* at 16. Ventura County had the highest number of schools (12) and the highest number of students (13,045) in the top 5% of schools. *Id.* at vii.

Rio Mesa High School, Rio del Valle Middle School, and Rio Lindo Elementary School are located in Ventura County, are majority Latino public schools, and exceeded health-based methyl bromide exposure thresholds between 1995-2001. ER 2:260-261 (Complaint ¶¶19, 21-22, 24-27).

**EPA's History of Enforcing its Title VI Implementing Regulations.**

EPA has a longstanding history of not adhering to its Title VI regulations. This includes failing to process Title VI complaints in a timely manner, including the *Angelita C.* complaint. ER 2:265-266, 271 (Complaint ¶¶41, 43, 46, 68). In October 14, 1996, sixteen Title VI complainants sent a letter to Carol Browner, then EPA Administrator, to raise the issue of EPA's failure to adhere to its own regulatory deadlines to process sixteen specific Title VI complaints. *Id.* Of the sixteen complaints referenced in the letter, eleven had been accepted for investigation and five had yet to be accepted, rejected, or referred for investigation. *Id.* EPA failed to adhere to its regulatory deadlines with respect to all sixteen Title VI complaints. *Id.*

On December 9, 1996, Administrator Browner responded, agreeing that "the Agency needs to improve the timeliness of its decisional process, including the process of accepting or rejecting complaints soon after they are filed." ER 2:272 (Complaint ¶69). Administrator Browner informed the Title VI complainants that EPA has taken steps to "enhance the investigation and processing of Title VI

complaints to address the very concerns raised in your letter," including increasing staff, establishing a Title VI Workgroup and a Title VI Complaint Task Force to address the Title VI complaint back log. *Id*.

On August 26, 2000, fifty-nine Title VI complainants submitted comments on EPA's Draft Revised Guidance for Investigating Title VI Administrative Complaints Challenging Permits and Draft Title VI Guidance for EPA Assistance Recipients Administering Environmental Permitting Programs. ER 2:272 (Complaint ¶70); *see also* 65 Fed.Reg. 39650 (June 27, 2000). Of those fifty-nine complaints, forty-one were under consideration or had been accepted for investigation. *Id*. Eighteen had been rejected on procedural or other technical grounds. *Id*. To date, EPA has not responded to comments on the Draft Revised Investigation Guidance or the Draft Recipient Guidance and has not published final guidances.

Between 2006 and 2007, EPA failed to process a single Title VI complaint in accordance with its regulatory deadlines. *Rosemere Neighborhood Association v. EPA*, 581 F.3d 1169, 1175 (9th Cir. 2009). In holding that EPA failed to demonstrate mootness after its post-complaint action dismissing the plaintiff's Title VI administrative complaint, the Ninth Circuit observed that EPA's handling of Title VI complaints demonstrated "a consistent pattern of delay." *Id*.

On March 21, 2011, Deloitte Consulting, LLP released its report commissioned by EPA, EVALUATION OF THE EPA OFFICE OF CIVIL RIGHTS (hereafter "Deloitte Report") that identified key areas plaguing EPA's enforcement of Title VI and offered recommendations to improve EPA's "significant performance challenges." ER 2:272-273 (Complaint ¶72); ER 2:95. The Deloitte Report found that OCR has consistently not adequately adjudicated Title VI Complaints. ER 2:272-273 (Complaint ¶72); ER 2:95, 113. The Report found that in only 6% of complaints (15 out of 247), EPA complied with its initial regulatory deadline to accept, reject or refer a complaint. ER 2:113. The report found the backlog of Title VI cases at OCR dated as far back to 2001, and many cases had been awaiting action up to and exceeding eight years. ER 2:96.

The Deloitte Report found that, among other findings, delays in processing complaints are the result of (1) the complexity in determining whether a complaint falls within EPA's jurisdiction; (2) a lack of EPA methods to conduct needed analyses; (3) a lack of standard operating procedures; and (4) a lack of supporting resources from EPA program and regional staff who have no incentive to prioritize Title VI investigations above their own program and region-related work. ER 2:121-2. The report concluded by offering specific recommendations for improving the poor performance of OCR's Title VI program. ER 2:272; ER 2:114.

21

On April 12, 2011, EPA's Civil Rights Executive Committee responded to the Deloitte Report by releasing recommendations in the final report entitled DEVELOPING A MODEL CIVIL RIGHTS PROGRAM FOR THE ENVIRONMENTAL PROTECTION AGENCY. ER 2:273 (Complaint ¶73).

## SUMMARY OF THE ARGUMENT

This case involves EPA's failure to investigate and prevent disparate impacts of pesticide use in California despite an unequivocal mandate in Title VI of the Civil Rights Act that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The District Court erred when it dismissed Garcia's Administrative Prodcedure Act claim challenging EPA's investigation, settlement, and dismissal of *Angelita C.* First, the District Court erred when it held that Title VI and EPA's implementing regulations lacked law to apply and thus precluded judicial review. To the contrary, sections 601 and 602 of the Civil Rights Act, EPA's implementing regulations, and disparate impact case law provide meaningful standards to guide judicial review. In addition, section 603 of the Civil Rights Act, 42 U.S.C. § 2000d-2, ensures judicial review of EPA's decision to continue funding CDPR.

Second, the District Court erred when it held that the California Food and Agricultural Code provides an adequate remedy and precludes judicial review under the APA. California pesticide law only allows a person to challenge an individual pesticide application permit. This does not provide an adequate remedy for two reasons. First, the District Court did not follow controlling Supreme Court and Ninth Circuit precedent that holds that Congress must provide the alternative remedy in order to displace judicial review under the Administrative Procedure Act. Second, the District Court did not recognize the differences between the remedial schemes for pesticide injury under California law and racial discrimination under the APA and the Civil Rights Act, while at the same time concluding that case-by-case permit challenges would adequately protect Latino schoolchildren from pesticide disparate impacts.

## ARGUMENT

### I. STANDARD OF REVIEW.

Dismissal for lack of subject matter jurisdiction is reviewed *de novo. Budget Rent-A-Car v. Higashiguchi*, 109 F.3d 1471, 1473 (9th Cir. 1997).

In considering this Motion to Dismiss under FED. R. CIV. P. 12(b)(1), the Court accepts all factual allegations in the complaint as true. *Carson Harbor Village, Ltd. v. City of Carson*, 353 F.3d 824, 826 (9th Cir. 2004). In so doing, the Court may consider facts alleged on the face of the complaint, in documents

attached to the complaint, and documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (brackets in original). Garcia thus appropriately cites documents herein including the *Angelita C.* settlement agreement, the *Angelita C.* Title VI complaint, the *Angelita C.* Exposure Assessment and Disparity Analysis, the *Angelita C.* Preliminary Finding, the EPA-commissioned Deloitte Report, and the Schools Report.

## II. EPA ACTIONS UNDER TITLE VI ARE SUBJECT TO JUDICIAL REVIEW.

The District Court erred by holding that EPA's action investigating, settling, and dismissing *Angelita C.* were committed to agency discretion by law and thus precluded from judicial review. ER 1:33 (Order 32:21-28). The Court misapplied *Heckler v. Chaney*, 470 U.S. 821 (1985), and the substantive law confining EPA's enforcement discretion to conclude that EPA's Title VI enforcement was not subject to judicial review. *Id*. This Court should reverse the District Court's order dismissing the APA claim because legal standards govern EPA's enforcement and because Congress expressly authorized judicial review of agency enforcement actions.

## A.     Title VI and EPA's Regulations Govern EPA's Enforcement and Provide Law to Apply.

This case does not reflect one of those rare instances where no law governs an agency's enforcement discretion.  In *Chaney*, the Supreme Court held that an agency's decision not to enforce the law is presumed immune from judicial review under the APA.  470 U.S. at 831 (citing four Supreme Court prosecutorial discretion decisions).  However, "Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue."  *Id*.  A party may rebut the presumption of nonreviewability when "the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers."  *Id*. at 833.

*Chaney* affirmatively did not overrule a D.C. Circuit decision holding prosecutorial discretion did not bar judicial review of an agency's enforcement of Title VI, stating that the Court's holding did not apply to "a situation where it could justifiably be found that the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities."  *Id.* at 833 fn. 4 (quoting *Adams v. Richardson*, 480 F.2d 1159, 1162 (1973) (en banc)).

The Ninth Circuit Court of Appeals has not applied the *Chaney* test to administrative settlements.  In *United States v. Carpenter*, the Ninth Circuit

considered whether the Attorney General appropriately settled a lawsuit. 526 F.3d 1237 (9th Cir. 2008). The Ninth Circuit held that even though the Attorney General has "plenary discretion . . . to settle litigation . . . a decision that is discretionary is not rendered unreviewable in all circumstances." *Id*. at 1241 (internal citations omitted). The Ninth Circuit further explained that even if an agency action is committed to absolute discretion by law, "courts have assumed the power to review allegations that an agency exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations." *Id.* (quoting *Guadamuz v. Bowen*, 859 F.2d 762, 767 (9th Cir. 1988)).

The Administrative Procedure Act allows judicial review except in those rare instances where Congress intended to preclude such review. EPA's actions are subject to judicial review under both the *Chaney* or *Carpenter* standards because Congress did not grant EPA complete discretion to enforce Title VI. Rather, the plain language of Title VI, as well as EPA's implementing regulations, unequivocally disallow federally subsidized racial discrimination and admit to no exceptions that would grant EPA discretion to resolve a complaint without fully investigating and preventing racial discrimination. Finally, judicial review may proceed under *Adams v. Richardson* because EPA's history of Title VI enforcement and its actions with respect to *Angelita C*. reflect a general policy that amounts to an abdication of EPA's statutory responsibilities.

1.      **The Administrative Procedure Act subjects EPA's enforcement authority to a strong presumption towards judicial review.**

The Administrative Procedure Act provides rigorous and broad judicial review of agency action. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971). The committed to agency discretion exception is "a very narrow exception . . . in the rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Id.* (quoting S. Rep. No 752, 79th Cong. 1st Sess., 26 (1945)). To determine whether or not meaningful law applies, *Overton Park* requires an "indication that Congress sought to prohibit judicial review and . . . [a] "showing of 'clear and convincing evidence' of a . . . legislative intent" to restrict access to judicial review. *Overton Park*, 401 U.S. at 410 (quoting *Abbott Laboratories* v. *Gardner*, 387 U.S. 136, 141 (1967)); *Chaney*, 470 U.S. at 830 (exception only applies "if the statute is drawn so that court would have no meaningful standard against which to judge the agency's exercise of discretion").

The District Court erred in declining to review this case when its decision referenced no Congressional intent to limit judicial review. As set forth in Section II.B, *infra*, Congress explicitly authorized judicial review in section 603 of the Civil Rights Act to "*any* person aggrieved," 42 U.S.C. § 2000d-2, for "every agency enforcement action." *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001).

27

Without Congressional intent precluding review, the District Court created an excessively deferential approach to reviewing agency enforcement actions. The District Court acknowledges *Chaney* and its rebuttable presumption of nonreviewability, but nevertheless cited several cases and concluded that, in the enforcement context, an agency's decision is generally within its discretion, unreviewable, and the "most that the Court may do is assess whether EPA followed the procedures set out in the regulations for investigating complaints." ER 1:14 (Order 14:25-26). None of the cases on which the District Court relies narrow *Overton Park* or *Chaney* to mean that a Court reviewing an agency's enforcement discretion under Title VI only considers the agency's own implementing regulations for procedural compliance and ignores the governing statutory scheme.

In *Drakes Bay Oyster Co. v. Jewell*., the Ninth Circuit considered the question of whether an action by the Secretary of the Interior, in making a decision to extend a permit for an oyster farming operation at Pt. Reyes National Seashore, was committed to agency discretion by law. 729 F.3d 967, 976-977 (9th Cir. 2013). The Ninth Circuit held that the Secretary was authorized, not required, to issue the permit and there were no statutory restrictions or definitions prescribing qualifications for issuance. *Id*. at 977. In a manner similar to *Carpenter*, the Ninth Circuit then proceeded to apply the principle that the Court still had jurisdiction to

28

determine "whether the Secretary followed whatever legal restrictions applied to his decision-making process." *Id*.

The District Court also cited *Spencer Enterprises, Inc., v. United States*, but in that case the Ninth Circuit did not depart from *Chaney*. 345 F.3d 683, 688 (9th Cir. 2003) (holding that statutory requirements governed an EB-5 visa determination and judicial review was not precluded). The court recognized that even "where statutory language grants an agency 'unfettered discretion,' its decision may nonetheless be reviewed if regulations or agency practice provide a "'meaningful standard' by which this court may review its exercise of discretion.'" *Id*. (quoting *Socop-Gonzalez v. INS*, 208 F.3d 838, 844 (9th Cir. 2000)).

The District Court cited three cases dealing with settlement actions. ER 1:14 (Order 13:11-17) (citing *Association of Irritated Residents v. EPA*, 494 F.3d 1027, 1031 (D.C. Cir. 2007); *Baltimore Gas & Elec. Co. v. F.E.R.C.*, 252 F.3d 456, 457 (D.C. Cir. 2001); *United States v. Carpenter*, 526 F.3d 1237, 1241-1242 (9th Cir. 2008)). But these cases do not mean Garcia is not entitled to judicial review under the APA because none of them considered whether Title VI of the Civil Rights Act or EPA's implementing regulations provide "law to apply".[5]

---

[5] The District Court misstated the holding in *U.S. v. Carpenter*. The District Court observed that the Ninth Circuit in *Carpenter* concluded "that [the] decision to settle is within agency discretion but not applying the *Chaney* presumption." ER 1:14 (Order 13:16-17). The Ninth Circuit held that even though the Attorney General has plenary discretion to settle litigation under 28 U.S.C. §§ 516 and 519,

## 2. Title VI and EPA's regulations limit EPA's discretion.

Title VI and the implementing regulations do not grant EPA discretion to resolve a complaint without fully investigating and fully preventing racial discrimination. The Supreme Court has allowed agency action to evade judicial review only when no law applies to govern that action. In order to determine if there is enough "law to apply," this Court should look first to the governing statutory scheme. *Overton Park*, 401 U.S. at 411. Applying the statutory purpose, the Court held that protection of parkland "was to be given paramount importance" and if "the statutes are to have any meaning, the Secretary cannot approve the destruction of parkland unless he finds that alternative routes present unique problems." *Id.* at 413.

The Supreme Court followed *Overton Park* with *Chaney*, in which the Court held that an agency's decision not to enforce the law is presumed immune from judicial review under the APA. *Chaney*, 470 U.S. at 831. But *Chaney* does not provide EPA with immunity here. Garcia rebuts the *Chaney* presumption because,

---

the Ninth Circuit still determines whether "an agency exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations." *Carpenter*, 526 F.3d at 1241-1242 (holding that a settlement violated the Federal Land Policy and Management Act because the Attorney General "settled the lawsuit in a manner that he was not legally authorized to do"). *Carpenter* does not stand for the proposition that a federal agency has discretion to settle an enforcement action. No agency was even a party in *Carpenter*.

as described below, Title VI and EPA's regulations provide law for this Court to apply. *Chaney*, 470 U.S. at 832-833; *Greater Los Angeles Council on Deafness, Inc. v. Baldridge*, 827 F.2d 1353, 1361 (9th Cir. 1987) (en banc) (regulations provide law to apply to rebut *Chaney* presumption).

The very existence of sections 601 and 602 of the Civil Rights Act and their plain language provide an absolute prohibition on federally funded racial discrimination combined with an unequivocal directive to all federal agencies to implement that guarantee with no exceptions, loopholes, or any other indication that an agency has discretion to disregard the mandate. *See* 42 U.S.C. §§ 2000d, 2000d-1. Section 601 provides:

> *No person* in the United States *shall*, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d (emphasis added). Such unequivocal language prevents EPA, when investigating and resolving a complaint, from undermining the protection enjoyed by every person in the United States to be free from EPA-funded discrimination. In other words, section 601 prevents EPA from circumscribing Congress's undeniable ban on funding entities that engage in discrimination.

Section 601 creates a right to freedom from discrimination that is "majestic in its sweep" that "reveals a congressional intent to halt federal funding of entities that violate a prohibition of racial discrimination similar to that of the

Constitution." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 284 (1978)

(holding that "Title VI must be held to proscribe only those racial classifications

that would violate the Equal Protection Clause or the Fifth Amendment").

Congress directed federal agencies dispensing federal funds to effectuate this

absolute protection from racial discrimination.

> Each Federal department and agency which is empowered to extend
> Federal financial assistance to any program or activity, by way of
> grant, loan, or contract other than a contract of insurance or guaranty,
> *is authorized and directed to effectuate the provisions of section 601*
> [42 USCS § 2000d] with respect to such program or activity by
> issuing rules, regulations, or orders of general applicability which
> shall be consistent with achievement of the objectives of the statute
> authorizing the financial assistance in connection with which the
> action is take.

42 U.S.C. § 2000d-1 (emphasis added). In *Sandoval*, the Supreme Court observed

that section 602

> limits [federal] agencies to 'effectuating' rights already created by §
> 601. And the focus of § 602 is twice removed from the individuals
> who will ultimately benefit from Title VI's protection . . . it focuses
> neither on the individuals protected nor even on the funding recipients
> being regulated, but on the *agencies* that will do the regulating.

*Sandoval*, 532 U.S. at 289 (internal citations omitted) (interpreting the text and

structure of Title VI to hold that no private right of action exists to enforce

disparate impact regulations promulgated pursuant to section 602). Section 602

thus directs agency action to effectuate section 601.

The D.C. Circuit considered the issue of whether "enforcement of Title VI is committed to agency discretion, and that review of such action is therefore not within the jurisdiction of the courts." *Adams v. Richardson*, 480 F.2d 1159, 1161 (D.C. Cir. 1973). *Adams* held that judicial review was appropriate because "Title VI not only requires the agency to enforce the [Civil Rights] Act, but also sets forth specific enforcement procedures" and because the agency has "adopted a general policy which is in effect an abdication of its statutory duty." *Id*. at 1162.[6]

*Sandoval* is not the only Supreme Court decision to rely on the administrative enforcement mechanism as the fundamental basis for protecting victims of disparate impact violations, as opposed to intentional discrimination. "To ensure that this intent would be respected, Congress included an explicit provision of 602 that requires that *any administrative enforcement action* be 'consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with the action is taken.'" *Guardians Association v. Civil Service Commission*, 463 U.S. 582,

---

[6] The District Court distinguished *Adams* as factually distinct from this action, stating that "EPA did investigate the complaint, made preliminary findings, and secured a settlement." ER 1:17 fn. 4. The District Court did not acknowledge that the First Amended Complaint alleged a recurring pattern of EPA's abdication of its statutory enforcement responsibility far greater than that which occurred when EPA took twelve years to investigate, settle, and dismiss *Angelita C.* Nor does *Chaney* overrule *Adams*, as the District Court inferred. *Id. Chaney* did not involve an issue of whether an enforcement action under the Civil Rights Act was not subject to judicial review and expressly limited its holding to avoid overruling *Adams*. *Chaney*, 470 U.S. at 833 fn. 4.

601 (1983) (emphasis added) (quoting 42 U.S.C. §2000d-1 and holding that injunctive relief is the only "private remedy for Title VI violations not involving intentional discrimination").

Further, section 602 expressly requires EPA to attempt to secure compliance with section 601 through voluntary means before imposing the expansive remedial scheme, which includes suspension of funding or any other means authorized by law to achieve compliance. 42 U.S.C. § 2000d-1. Given the plain language of sections 601 and 602, plus the Supreme Court's reliance on mandatory administrative enforcement, the Civil Rights Act thus provides law to apply to enable judicial review of EPA's resolution of the *Angelita C.* complaint.

In addition to the statutory provisions of Title VI, the implementing regulations promulgated pursuant to section 602 limit EPA's discretion and provides additional law to apply by codifying the disparate impact standard. A recipient of EPA financial assistance "shall not use criteria or methods of administering its program or activity which have the effect of subjecting individuals to discrimination because of their race, color, national origin, or sex[.]" 40 C.F.R. § 7.35(b). This firm limit on permissive recipient activities also shapes the contours of EPA discretion to investigate, settle, and dismiss *Angelita C.*: EPA

34

has no discretion to resolve a complaint and allow a recipient to avoid this mandate.

The District Court committed four errors when analyzing and applying the regulations to hold EPA had absolute, unreviewable enforcement discretion. ER 1:14 (Order 13:23-17:6). First, the District Court justified this absolute discretion by mistakenly holding that EPA's regulations do not require EPA to investigate Title VI complaints, which gives EPA total discretion to deciding whether and how it would investigate a Title VI complaint. ER 1:15 (Order 14:3-10). To the contrary, the "[Office of Civil Rights] *shall* promptly investigate *all* complaints filed under this section unless the complainant and the party complained against agree to a delay pending settlement negotiations." 40 C.F.R. § 7.120 (emphasis added).[7] The District Court thus erred when it concluded that EPA "having discretion to determine whether to accept or reject a complaint for investigation necessarily entails discretion to determine the subject matter and extent of the investigation." ER 1:15 (Order 18-10). Because EPA *shall* investigate *all* complaints, it does not possess the discretion to ignore evidence showing that

---

[7] "The word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive." *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 661 (2007) (quoting Black's Law Dictionary 1375 (6th ed. 1990)).

methyl bromide had been replaced by other fumigants after 2001. 40 C.F.R. §
7.120; ER 2:279 (Complaint ¶87); ER 2:274-6 (Complaint ¶¶76-83).[8]

Second, the District Court erroneously observed that EPA was not required
to impose remedies under section 602 if EPA could not secure voluntary
compliance, impliedly holding that a decision to continue funding was committed
to agency discretion by law. ER 1:19 (Order 18:12-15). The court ignores the
mandatory elements of Title VI and EPA's regulations. EPA "shall" first attempt
to secure voluntary compliance before resorting to other remedies. 42 U.S.C. §
2000d-1. If the recipient fails to come into voluntary compliance, EPA "must
start" the procedure to deny or rescind federal financial assistance. 40 C.F.R. §
7.115(e); 40 C.F.R. § 7.130(b) (required procedure). If EPA cannot secure
voluntary compliance, it has no discretion to abandon the remedial scheme.

Third, the regulations further constrain EPA's discretion to limit an
investigation by permitting dismissal only if EPA finds *no* violation of Title VI.

> Dismissal of complaint. If OCR's investigation reveals no
> violation of this part, the Director, OCR, will dismiss the complaint
> and notify the complainant and recipient.

---

[8] EPA's regulations do specify several jurisdictional requirements which would
support an EPA decision to reject a complaint. *See, e.g.,* 40 C.F.R. §§ 7.120(b)(1)
(complaint must be in writing and state the alleged discriminatory acts);
7.120(b)(2) (complaint must be filed within 180 days of an alleged discriminatory
act unless EPA waives noncompliance for good cause shown). No regulatory or
statutory provision grants EPA blanket authority to reject complaints or limit
investigations.

36

40 C.F.R. § 7.120(g). Since EPA may only dismiss a complaint after finding no violations of EPA's regulations, a claim that EPA failed to fully investigate a complaint is judicially reviewable.

Fourth, the District Court erred when it held that there was no standard by which it could determine "compliance" with EPA's regulations since it was undefined. ER 1:16 (Order 15:15-27). "The regulations then only speak generally of 'securing compliance' and provide procedures for EPA to do so, but nowhere does Title VI or its regulations explain what constitutes 'compliance' or what the criteria are for determining whether an individual was wrongfully 'excluded' or 'subjected to discrimination.'" ER 1:16 (Order 15:22-25). As specifically required by section 602 of the Civil Rights Act, EPA's implementing regulations require EPA to first secure "compliance" with Title VI using "voluntary compliance agreements" before resorting to the other remedies authorized by Congress. 42 U.S.C. § 2000d-1; 40 C.F.R. §§ 7.115(c)(1)(ii), (d), (e), and (f); 40 C.F.R. §§ 7.130(a), (b)(1). Compliance is not some vague standard, but rather well defined by Title VI caselaw and subject to judicial review.

While the District Court correctly observes that the regulations do not define "compliance," ER 1:16 (Order 15:15-16:8), it erred when it concluded courts lack the capacity to determine compliance with anti-discrimination laws. The D.C. Circuit specifically rejected such an argument and held that compliance with Title

VI was ascertainable by courts and thus subject to judicial review.  *See Adams*, 480

F.2d at 1162 ("a substantial and authoritative body of caselaw provides the criteria

by which noncompliance can be determined").  Besides the fact that the meaning

of "compliance" is self-evident given the anti-discrimination mandate in section

601 and the disparate impact prohibition in 40 C.F.R. § 7.35(b), courts determine

compliance with Title VI under well-established principles, providing ample law to

apply.  *See, e.g.*, *Georgia State Conference of Branches of NAACP v. Georgia*, 775

F.2d 1403, 1417 (11th Cir. 1985) (stating elements of a disparate impact claim

under Title VI); *Sandoval v. Hagan*, 197 F.3d 484, 507 (11th Cir. 1999) (stating

elements of a disparate impact claim under Title VI), reversed on other grounds by

*Alexander v. Sandoval*, 532 U.S. 275 (2001); *Powell v. Ridge*, 189 F. 3d 387, 393-

394 (3rd Cir. 1999) (stating elements of a disparate impact claim under Title VI);

*South Camden Citizens in Action v. New Jersey Department of Environmental

Protection*, 145 F.Supp.2d 446 (D.N.J. 2001) (stating elements of a disparate

impact claim under Title VI), overruled on other grounds by *Sandoval*, 532 U.S. at

293.  Accordingly, the District Court erred when it held that Title VI did not

provide law to apply.

3. **EPA's actions resolving *Angelita C*. are subject to judicial review as part of a general policy abdicating EPA's statutory responsibilities.**

The District Court further erred in declining to review EPA's actions investigating, settling, and dismissing *Angelita C*. when the allegations in the complaint, which the District Court should accept as true, demonstrate EPA's abdication of its Title VI enforcement obligations. Under *Chaney*, the Supreme Court declined to include in its presumption of nonreviewability the situation where the agency "has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." *Chaney*, 470 U.S. at 833, fn. 4 (quoting *Adams*, 480 F. 2d at 1162). *Adams* stands for the proposition that the consistent failure of an agency to take specified actions under Title VI renders its actions subject to judicial review because they are part of a dangerous problem resulting in the non-enforcement of the statute as a whole. Such a situation presents itself here, and as it did in *Rosemere*, where the Ninth Circuit recognized EPA's consistent failure to enforce Title VI.

As thoroughly described in the Statement of Facts, *supra*, EPA's consistent pattern of delay, inaction and failure to take act as required by its regulations implementing Title VI, both with respect to *Angelita C*. and EPA's overall Title VI enforcement program, reflects an agency policy of non-enforcement and failure to protect persons in the United States from federally funded racial discrimination.

39

This pattern has persisted for decades during the tenure of several EPA administrators and reflects conduct "so extreme as to amount to an abdication of [EPA's] statutory responsibilities." *Chaney*, 470 U.S. at 833, fn. 4

### B.    The Civil Rights Act Authorizes Judicial Review.

The District Court disregarded the plain meaning of section 603 of the Civil Rights Act, declined to interpret the Act broadly to effect its remedial purpose, and did not consider the Supreme Court's resolution of *Sandoval* when the District Court held that section 603 did not authorize judicial review of a decision to continue funding.  ER 1:19 (Order 18:5-13).  Section 603 provides:

> Any department or agency action taken pursuant to section 602 [42 USCS § 2000d-1], shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds. In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 602 [42 USCS § 2000d-1], any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with section 10 of the Administrative Procedure Act [5 USCS §§ 701 et seq.], and such action shall not be deemed committed to unreviewable agency discretion within the meaning of that section [5 USCS §§ 701 et seq.].

42 U.S.C. § 2000d-2.

When interpreting section 603, this Court "must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut National Bank v. Germain*, 503 U.S. 249, 253-254 (1992).

40

Furthermore, this Court should follow the "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant." *Kungys v. United States*, 485 U.S. 759, 778 (1988). Finally, this Court should interpret section 603 broadly to effectuate the Civil Rights Act's remedial purpose. *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 816 (9th Cir. 2002) (holding that Title VII's definition of "employee" does not prohibit counting the foreign employees of U.S.-controlled corporations for determining coverage).

The first sentence of section 603 dictates that judicial review of agency action should proceed under existing law. *See Marlow v. U.S. Department of Education*, 820 F.2d 581, 582 (2d Cir. 1987). Such existing law includes the APA, subject to the limitation on review of agency action committed to agency discretion by law. *Id*. (citing 5 U.S.C. § 701(a)(2)). The second sentence makes reviewable certain actions regardless of whether such actions are committed to agency discretion by law. Such circumstances include an agency "action . . . to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 602." 42 U.S.C. § 2000d-2. Finally, this Court should not follow the District Court's erroneous interpretation which makes section 602's use of the phrases "terminating . . . financial assistance" and "refusing . . . to continue financial assistance" redundant. ER 1:19 (Order 18:2-15). While perhaps

41

"ungrammatical", *id.*, this Court should not interpret the statute to condone this redundancy and not effectuate the remedial purpose of the statute.

The phrase "any person aggrieved" demonstrates broad Congressional intent to accord standing beyond just a funding recipient and to the fullest extent permitted by the case and controversy provision of Article III. *See Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 212 (1972) (holding that the term "aggrieved person" in Title VIII of the Civil Rights Act afforded broad standing to all residents in a housing unit "who are injured by racial discrimination"); *see also* 42 U.S.C. § 2000d ("No person in the United States shall" suffer racial discrimination at the hands of a recipient of federal funding). Congress intentionally framed the statutory language broadly, giving any person standing to seek judicial review of any agency enforcement action.

In *Sandoval*, the Supreme Court expansively interpreted the judicial review provision of agency action in section 603 when it held that agencies, not private persons, could enforce disparate impact regulations. *Sandoval*, 532 U.S. at 293. The Court outlined the structure and purpose of judicial review in section 603 in the context of how it functioned collectively with sections 601 and 602 to indicate Congressional intent to preclude a private right of action to enforce disparate impact regulations. *Id.* at 289-291. The Court emphasized Congressional intent to

42

ensure "*every agency enforcement action* is subject to judicial review." *Sandoval*,

532 U.S. at 289 (emphasis added).

*Hardy v. Leonard*, 377 F.Supp. 831 (N.D. Cal. 1974), provides additional

support for affording judicial review here. In *Hardy*, the plaintiffs sought review

of the Law Enforcement Assistance Administration's actions to not terminate

funding to the Oakland Police Department under Title VI. *Hardy*, 377 F.Supp. at

837. The court recognized that judicial review by a complainant challenging

agency action to continue funding advanced the purpose of Title VI. "Neither

these cases nor any other authority cited by defendants or otherwise known to this

Court suggests why judicial review of a final agency decision *not* to terminate

funds is not equally proper and necessary if the integrity of the scheme erected by

Congress under Title VI is to be protected." *Id*. at 837.

Given *Sandoval*, this Court should interpret section 603 broadly to advance

the remedial purpose of Title VI and provide Garcia with access to judicial review.

With no right of action to obtain relief for disparate impacts under Title VI, Garcia

must rely on EPA to protect their interests, something EPA has consistently failed

to do not just in this case, but throughout EPA's Title VI enforcement history. *See*

Statement of Facts, *supra*. Interpreting section 603 to afford one-sided judicial

review for only funding termination decisions, combined with the District Court's

holding that EPA's enforcement actions are committed to agency discretion by law

and not subject to judicial review, make no sense in a statute designed to ensure that federal agencies prevent racial discrimination.

## III.  CALIFORNIA PESTICIDE LAWS DO NOT DISPLACE JUDICIAL REVIEW UNDER THE ADMINISTRATIVE PROCEDURE ACT.

The Administrative Procedure Act provides for judicial review unless Congress has provided an adequate judicial remedy.  "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  5 U.S.C. § 704.  The District Court committed two legal errors.

First, the District Court did not follow controlling Supreme Court and Ninth Circuit precedent that hold Congress must provide the alternative remedial scheme in order to displace judicial review under the Administrative Procedure Act. Despite acknowledging that there was no authority "that a remedy not provided by Congress can be 'adequate'", the Court held that section 704 did not specify a court of the United States, which thus allows state law remedies.  ER 1:22 (Order 21:1-2).

Second, the District Court did not recognize the different remedial schemes for pesticide injury under California law, and racial discrimination under the APA and the Civil Rights Act, to conclude that case-by-case permit challenges would adequately protect Latino schoolchildren from pesticide related disparate impacts. ER 1:19-25 (Order 18-24).  More specifically, the District Court held that the

remedy provided by California state law is adequate because (1) the state remedy need not be the same as available under the APA or the Civil Rights Act; and (2) Garcia can ensure pesticide use permits comply with state law alleviating their injury to pesticide exposure and would be more effective than what EPA would provide. ER 1:22-25 (Order 21-24).

## A.     Only Congress May Provide Adequate Alternative Remedies.

The pesticide remedies available under the California Food and Agricultural Code are inadequate as a matter of law. The District Court incorrectly holds a *state* law may be an adequate remedy under the APA sufficient to preclude judicial review. ER 1:21-22 (Order 20-21). Only Congress may provide a remedy to displace APA review, however, and the District Court identified no authority that would allow a state legislature to create a remedial scheme that would undermine the APA. "When Congress enacted the APA to provide a general authorization for review of agency action in the district courts, it did not intend that general grant of jurisdiction to duplicate the previously established special statutory procedures relating to specific agencies." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (holding remedies in the Claims Court under the Tucker Act were inadequate remedies because the plaintiffs could not obtain injunctive relief). Section 704 "does not provide additional judicial remedies in situations where the Congress has provided special and adequate review procedures." *Id*. (quoting Attorney

45

General's Manual on the Administrative Procedure Act 101 (1947)); *see also Brem-Air Disposal v. Cohen*, 156 F.3d 1002, 1004 (9th Cir. 1998) (the inquiry is whether "Congress preclude[s] APA review by providing such an alternative remedy").

The District Court distinguished *Bowen* on the grounds that it did not involve an issue of state law remedies. ER 1:21 (Order 20). But the District Court did not follow the rationale underlying the holding in *Bowen* and the Ninth Circuit's application of *Bowen*, because the question is whether Congress provides an alternative remedy. *Brem-Air Disposal*, 156 F.3d at 1004.

Nor does *Coker v. Sullivan*, 902 F.2d 84 (D.C. Cir. 1990), another case on which the District Court relies, allow state law remedies to displace judicial review. In *Coker*, the D.C. Circuit held that Congressionally mandated fair hearing procedures, combined with federal remedies under the Supremacy Clause and 42 U.S.C. § 1983 against the states, provided adequate remedies for the denial of Emergency Assistance benefits provided by the Aid to Families with Dependent Children. *Coker*, 902 F.2d at 89-90. *Coker* thus involved remedies provided by Congress. Furthermore, unlike *Coker*, Garcia and other similarly situated aggrieved persons have no private right of action to enforce EPA's Title VI disparate impact regulations on which EPA based its Preliminary Finding. *Sandoval*, 532 U.S. at 293; ER 2:244 ("there is sufficient evidence to make a

46

preliminary finding of a prima facie violation of Title VI as a result of the adverse disparate impact upon Latino schoolchildren in California from the application of methyl bromide between 1995 and 2001"). Thus, the state law remedy under the California Food and Agricultural Code cannot and does not displace the District Court's review of EPA actions resolving *Angelita C.*

**B.     California Pesticide Laws do not Remedy Racial Discrimination.**

Even if state law remedies could displace judicial review under the APA – which they do not – the California pesticide laws do not provide a remedy for federally subsidized racial discrimination which Garcia can obtain through review under the Administrative Procedure Act. Moreover, the procedure under the California Food and Agricultural Code burdens victims of racial discrimination like Garcia, making the remedy inadequate.

The District Court conflates the remedies provided by Title VI with those provided under California law. ER 1:23-24 (Order 22-23). Title VI protects Garcia from racial discrimination, a distinct injury not covered by California pesticide laws. 42 U.S.C. § 2000d; Cal. Food and Agricultural Code §§ 14009(d), (g) (provisions limiting issues for administrative appeals and judicial review). The California Legislature did not design the Food and Agricultural Code to remedy discrimination, but rather to ensure that a permit is consistent with a pesticide product's label and other requirements which do not mention or require

compliance with civil rights laws. *Id*. The District Court acknowledges the lack of legal authority and factual history showing this remedial scheme in practice. ER 1:24 (Order at 23:8-10).

Here, Garcia seeks declaratory relief and injunctive relief vacating the settlement and reopening the Title VI complaint investigation, relief that California pesticide law does not provide. *See Bowen*, 487 U.S. at 904; *Tucson Airport Authority v. General Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998) (no adequate remedy at Court of Federal Claims because it would not provide injunctive relief sought by General Dynamics). "The Supreme Court has repeatedly upheld an aggrieved party's prompt access to the district court when it provides greater redress and broader opportunity to develop a claim than is available in a more limited statutory scheme." *Chang v. USA*, 327 F.3d 911, 923 (9th Cir. 2003) (citing *Bowen*, 487 U.S. at 904).

On remand, EPA would have to comply with the remedial scheme in Title VI, which mandates CDPR's compliance with section 601 and 40 C.F.R. § 7.35(b), termination of federal financial assistance to CDPR, or securing compliance with section 601 and 40 C.F.R. § 7.35(b) "by any other means authorized by law." 42 U.S.C. § 2000d-1. Under the California Food and Agricultural Code, Garcia could only prevent or modify permits on a permit-by-permit basis and only to ensure compliance with state law. Cal. Food and Agricultural Code §§ 14009(d), (g).

48

Thus, the state remedial scheme neither remedies EPA's conduct handling the *Angelita C.* complaint nor ensures that EPA provides the remedies required by Congress to prevent federally subsidized racial discrimination, and therefore does not provide an adequate remedy that would displace judicial review under the APA.

Furthermore, compliance with environmental laws do not equate to compliance with Title VI. *See South Camden Citizens in Action*, 145 F.Supp.2d at 475-480 (rejecting argument that permitting complied with state law and holding that defendants failed "to consider the potential adverse, disparate impact of the [SLC permit] on individuals based on their race, color, or national origin, as part of its decision to permit SLC's proposed facility"), overruled on other grounds by *Sandoval*, 532 U.S. at 293. Even after *Sandoval*, EPA itself acknowledges this fundamental legal principle. "It is important to bear in mind that compliance with federal and/or state environmental regulations, does not, by itself, ensure compliance with Title VI." ER 2:243 (Preliminary Finding).

Finally, the District Court's holding places an unfair burden on parents of Latino schoolchildren. Under the California Food and Agricultural Code, Garcia and any other parent of a Latino child at a school suffering disparate impacts from pesticide pollution must challenge any and all proposed permits near those schools every year their children attend school. A parent would need to ascertain which

growers apply for permits, properly exhaust appeals to the Agricultural

Commissioner and CDPR, and if necessary file an action in California state court

for *each permit challenged*.  Cal. Food and Agricultural Code § 14009.  Compared

to the remedies available under the APA and Title VI, this process places a heavy

obligation on parents, making it difficult for them to succeed even if parents had

the time and resources to devote to the process.  The District Court imposed an

undue burden on Garcia and other similarly situated parents to resort to self-help

remedies when the Administrative Procedure Act affords a remedy that ensures

EPA complies with Title VI and provides the remedies that Congress directed in

order to prevent federally subsidized racial discrimination.

## IV.  STANDING.

At the conclusion of its analysis of the adequate remedy issue, the District

Court noted that EPA argued, in a footnote in EPA's briefing, that Garcia lacks

"standing to seek relief for alleged future injury that their children – who are

between the ages of one and five – may experience in middle or high school

because the harm is too speculative given that a number of intervening events

could occur[.]"  ER 1:25 (Order 24 fn. 7).  The District Court declined to rule on

the standing issue.  *Id.*

Garcia has standing.  First, Garcia suffers injury in fact sufficient to

demonstrate standing, as demonstrated by allegations in the First Amended

Complaint. ER 2:257, 260-262, 269, 274-279 (Complaint ¶¶19-28, 57-58, 76-84, Figures 1-5). These allegations demonsrate that the Garcia children attend, or will attend, majority Latino schools in Ventura County where EPA found disparate impacts to unhealthy exposures of methyl bromide. These allegations also demonstrate that other harmful fumigants replaced methyl bromide and are used heavily in close proximity to those schools. The Schools Report further corroborates these allegations. *See* Schools Report, attached as Exhibit 1 to the Motion to Take Judicial Notice. Finally, EPA did not prevent these current and future harms to Garcia when it settled *Angelita C*. ER 2:251-253 (Settlement Agreement ¶¶15-16), 2:268 (Complaint ¶56).

The Complaint also alleges procedural injuries beyond exposure to pesticides and fumigants, including EPA's failure to evaluate exposure conditions subsequent to 2001, limiting the investigation to only methyl bromide, and not including substantive protections in the settlement agreement. ER 2:262, 266-267, 268 (Complaint¶¶28-29, 47, 55). Procedural injuries are sufficient to confer standing. *Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009); *Turtle Island Restoration Network v. United States Department of State*, 673 F.3d 914, 919 (9th Cir. 2012).

Second, it is likely, and not conjectural or hypothetical, that the children will not only attend elementary school, but progress on through and graduate from Rio

Mesa High School, incurring injury all along the way. ER 2:260-262 (Complaint ¶¶19-27). EPA's strained view of standing runs counter to fundamental standing decisions such as *Friends of the Earth v. Laidlaw*, which held that plaintiffs established standing based on their connection to, and use of, the affected area and a reasonable fear of harm without the Court even considering whether the plaintiffs would move away or cease their injury through some kind of interceding event subsequent to filing the complaint. 528 U.S. 167, 183-185 (2000). The Supreme Court has never held that one suffering injury does not have standing because in the future that injury may potentially cease, nor does EPA cite such authority in its briefing on the motion to dismiss. It is also reasonably likely, and not hypothetical, that Angelica Guzman's and David Garcia's children will attend school at Rio Lindo, Rio del Valle, and Rio Mesa based on where they live now. ER 2:261 (Complaint ¶¶21-22); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 566 (1992).

Third, an order granting the relief Garcia requested in the First Amended Complaint will redress Garcia's injury by vacating EPA's actions and remanding the matter to EPA for action consistent with Title VI of the Civil Rights Act and EPA's implementing regulations. ER 2:262, 284-285 (Complaint ¶28, Prayer for Relief). Accordingly, Garcia has standing.

## V.     CONCLUSION.

For the reasons set forth above, Plaintiffs-Appellants Maria Garcia, David Garcia, and Angelica Guzman respectfully request that the Court reverse the decision of the District Court, remand the matter to the District Court, and issue an order directing the District Court to deny the motion to dismiss.

Dated:  May 1, 2015            /s Brent J. Newell
                               BRENT J. NEWELL
                               MADELINE STANTO

                               Counsel for Plaintiffs-Appellants
                               Maria Garcia, *et al.*

MICHAEL MEUTER
CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
3 Williams Road
Salinas, CA 93905
Telephone:  (415) 346-4179
Facsimile:  (415) 346-8723
Email:       mmeuter@crla.org

FRANCHESCA GONZALEZ
CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
338 South A Street
Oxnard, CA 93030
Telephone:  (805) 486.1068 ext. 113
Facsimile:  (805) 483.0535
Email:       agarcia@crla.org

VIRGINIA RUIZ,
FARMWORKER JUSTICE
1126 16th Street, N.W., Suite 270
Washington, DC 20036
Telephone:  (202) 293-5420
Facsimile:  (202) 293-5427
Email:       vruiz@farmworkerjustice.org

## STATEMENT OF RELATED CASES

There are no pending related cases.

**CERTIFICATE OF COMPLIANCE**

I certify that pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure and Ninth Circuit Rule 32-1, the attached brief is proportionally spaced, has a typeface of 14 points or more, and contains 11,988 words, exclusive of those parts of the brief exempted by Rule 32 (a)(7)(B)(iii). I have relied on Microsoft Word's calculation feature to calculate the word limit.

Dated: May 1, 2015                    /s Brent Newell
                                       Brent Newell

## CERTIFICATE OF SERVICE

I am employed in the County of Alameda, State of California. I am over the age of 18 and not a party to this action. My business address is: 1999 Harrison Street, Suite 650, Oakland, CA 94612.

On May 1, 2015, I electronically filed the foregoing document described as PLAINTIFFS-APPELLANTS' OPENING BRIEF, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered as CM/ECF users and will receive electronic service accomplished by the appellate CM/ECF system.

Executed on May 1, 2015 at Petaluma, California.


/s Brent Newell
Brent Newell

# ADDENDUM

INDEX OF ADDENDUM

Document                                                                    Bates Number

Federal Statues

5 U.S.C. § 701 ................................................................................1

5 U.S.C. § 704 ................................................................................3

28 U.S.C. § 1291 ............................................................................4

28 U.S.C. § 1331 ............................................................................6

28 U.S.C. § 1346 ............................................................................7

28 U.S.C. § 1391 ..........................................................................10

42 U.S.C. § 2000d ........................................................................19

42 U.S.C. § 2000d-1 .....................................................................20

42 U.S.C. § 2000d-2......................................................................21

Regulations

40 C.F.R. § 7.30 ...........................................................................13

40 C.F.R. § 7.35 ...........................................................................14

40 C.F.R. § 7.115 .........................................................................15

40 C.F.R. § 7.120 .........................................................................16

40 C.F.R. § 7.130 .........................................................................18

California Statutes

Cal. Food and Agricultural Code § 14009 ..................................22

## 5 USCS § 701

Current through PL 114-9, approved 4/7/15

*United States Code Service - Titles 1 through 54* > *TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES* > *PART I. THE AGENCIES GENERALLY* > *CHAPTER 7. JUDICIAL REVIEW*

# § 701. Application; definitions

(a) This chapter [*5 USCS §§ 701* et seq.] applies, according to the provisions thereof, except to the extent that--

  (1) statutes preclude judicial review; or

  (2) agency action is committed to agency discretion by law.

(b) For the purpose of this chapter [*5 USCS §§ 701* et seq.]--

  (1) ″agency″ means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include--

    (A) the Congress;

    (B) the courts of the United States;

    (C) the governments of the territories or possessions of the United States;

    (D) the government of the District of Columbia;

    (E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

    (F) courts martial and military commissions;

    (G) military authority exercised in the field in time of war or in occupied territory; or

    (H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49 [49 USCS §§ 47151 et seq.]; or sections 1884, 1891-1902, and former section 1641(b)(2), of title 50, appendix, and

  (2) ″person,″ ″rule,″ ″order,″ ″license,″ ″sanction,″ ″relief,″ and ″agency action″ have the meanings given them by section 551 of this *title [5 USCS § 551]*.

## History

  (Sept. 6, 1966, P.L. 89-554, § 1, 80 Stat. 392; July 5, 1994, *P.L. 103-272*, § 5(a), 108 Stat. 1373; Jan. 4, 2011, *P.L. 111-350*, § 5(a)(3), 124 Stat. 3841.)

**Prior law and revision:**

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| (a) | 5 USC Sec. 1009 (introductory clause). | June 11, 1946, ch 324, Sec. 10 (introductory clause), 60 Stat. 243. |

  In subsection (a), the words ″This chapter applies, according to the provisions thereof,″ are added to avoid the necessity of repeating the introductory clause of former section 1009 in sections 702-706.
  Subsection (b) is added on authority of section 2 of Act June 11, 1946, ch. 324, 60 Stat. 237, as amended, which is carried

5 USCS § 701

into section 551 of this title.

In subsection (b)(1)(G), the words ″or naval″ are omitted as included in ″military″.

In subsection (b)(1)(H), the words ″functions which by law expire on the termination of present hostilities, within any fixed period thereafter, or before July 1, 1947″ are omitted as executed. Reference to the ″Selective Training and Service Act of 1940″ is omitted as that Act expired on March 31, 1947. Reference to the ″Sugar Control Extension Act of 1947″ is omitted as that Act expired on March 31, 1948. References to the ″Housing and Rent Act of 1947, as amended″ and the ″Veterans' Emergency Housing Act of 1946″ have been consolidated as they are related. The reference to former section 1641(b)(2) of title 50, appendix, is retained notwithstanding its repeal by § 111(a)(1) of Act Sept. 21, 1961, Pub. L. 87-256, 75 Stat. 538, since § 111(c) of the Act provides that a reference in other Acts to a provision of law repealed by § 111(a) shall be considered to be a reference to the appropriate provisions of Pub. L. 87-256.

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

UNITED STATES CODE SERVICE

Copyright © 2015 Matthew Bender & Company, Inc. a member of the LexisNexis Group ™ All rights reserved.

2

## 5 USCS § 704

Current through PL 114-9, approved 4/7/15

*United States Code Service - Titles 1 through 54* > *TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES* > *PART I. THE AGENCIES GENERALLY* > *CHAPTER 7. JUDICIAL REVIEW*

## § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

## History

(Sept. 6, 1966, P.L. 89-554, § 1, 80 Stat. 392.)

**Prior law and revision:**

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ........... | 5 USC Sec. 1009(c) | June 11, 1946, ch 324, Sec. 10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

UNITED STATES CODE SERVICE

Copyright © 2015 Matthew Bender & Company, Inc. a member of the LexisNexis Group ™ All rights reserved.

## 28 USCS § 1291

Current through PL 114-9, approved 4/7/15

*United States Code Service - Titles 1 through 54* > *TITLE 28. JUDICIARY AND JUDICIAL PROCEDURE* > *PART IV. JURISDICTION AND VENUE* > *CHAPTER 83. COURTS OF APPEALS*

## Notice

 *Part 1 of 2*. You are viewing a very large document that has been divided into parts.

## § 1291. Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title [28 USCS §§ 1292(c) and (d) and 1295].

## History

(June 25, 1948, ch 646, 62 Stat. 929; Oct. 31, 1951, ch 655, § 48, 65 Stat. 726; July 7, 1958, P.L. 85-508, § 12(e), 72 Stat. 348; April 2, 1982, P.L. 97-164, Title I, Part A, § 124, 96 Stat. 36.)

**Prior law and revision:**

Based on title 28, U.S.C., 1940 ed., §§ 225(a), 933(a)(1), and section 1356 of title 48, U.S.C., 1940 ed., Territories and Insular Possessions, and sections 61 and 62 of title 7 of the Canal Zone Code (Mar. 3, 1911, ch. 231, § 128, 36 Stat. 1133; Aug. 24, 1912, ch. 390, § 9, 37 Stat. 566; Jan. 28, 1915, ch. 22, § 2, 38 Stat. 804; Feb. 7, 1925, ch. 150, *43 Stat. 813*; Sept. 21, 1922, ch. 370, § 3, 42 Stat. 1006; Feb. 13, 1925, ch. 229, § 1, 43 Stat. 936; Jan. 31, 1928, ch. 14, § 1, *45 Stat. 54*; May 17, 1932, ch. 190, *47 Stat. 158*; Feb. 16, 1933, ch. 91, § 3, 47 Stat. 817; May 31, 1935, ch. 160, *49 Stat. 313*; June 20, 1938, ch. 526, 52 Stat. 779; Aug. 2, 1946, ch. 753, Sec. 412(a)(1), 60 Stat. 844).

This section rephrases and simplifies paragraphs "First", "Second", and "Third" of section 225(a) of title 28, U.S.C., 1940 ed., which referred to each Territory and Possession separately, and to sections 61 and 62 of the Canal Zone Code, section 933(a)(1) of said title relating to jurisdiction of appeals in tort claims cases, and the provisions of section 1356 of title 48, U.S.C., 1940 ed., relating to jurisdiction of appeals from final judgments of the district court for the Canal Zone.

The district courts for the districts of Hawaii and Puerto Rico are embraced in the term "district courts of the United States."

(See definitive section 451 of this title.)

Paragraph "Fourth" of section 225(a) of title 28, U.S.C., 1940 ed., is incorporated in section 1293 of this title.

Words "Fifth. In the United States Court for China, in all cases" in said section 225(a) were omitted. (See reviser's note under section 411 of this title.)

Venue provisions of section 1356 of title 48, U.S.C., 1940 ed., are incorporated in section 1295 of this title.

Section 61 of title 7 of the Canal Zone Code is also incorporated in sections 1291 and 1295 of this title.

In addition to the jurisdiction conferred by this chapter, the courts of appeals also have appellate jurisdiction in proceedings under Title 11, Bankruptcy, and jurisdiction to review:

(1) Orders of the Secretary of the Treasury denying an application for, suspending, revoking, or annulling a basic permit under chapter 8 of title 27;

(2) Orders of the Interstate Commerce Commission, the Federal Communications Commission, the Civil Aeronautics Board, the Board of Governors of the Federal Reserve System and the Federal Trade Commission, based on violations of the antitrust laws or unfair or deceptive acts, methods, or practices in commerce;

(3) Orders of the Secretary of the Army under sections 504, 505 and 516 of title 33, U.S.C., 1940 ed., Navigation and

4

28 USCS § 1291

Navigable Waters;

(4) Orders of the Civil Aeronautics Board under chapter 9 of title 49, except orders as to foreign air carriers which are subject to the President's approval;

(5) Orders under chapter 1 of title 7, refusing to designate boards of trade as contract markets or suspending or revoking such designations, or excluding persons from trading in contract markets;

(6) Orders of the Federal Power Commission under chapter 12 of title 16;

(7) Orders of the Federal Security Administrator under section 371(e) of title 21, in a case of actual controversy as to the validity of any such order, by any person adversely affected thereby;

(8) Orders of the Federal Power Commission under chapter 15B of title 15;

(9) Final orders of the National Labor Relations Board;

(10) Cease and desist orders under section 193 of title 7;

(11) Orders of the Securities and Exchange Commission;

(12) Orders to cease and desist from violating section 1599 of title 7;

(13) Wage orders of the Administrator of the Wage and Hour Division of the Department of Labor under section 208 of title 29;

(14) Orders under sections 81r and 1641 of title 19, U.S.C., 1940 ed., Customs Duties.

The courts of appeals also have jurisdiction to enforce:

(1) Orders of the Interstate Commerce Commission, the Federal Communications Commission, the Civil Aeronautics Board, the Board of Governors of the Federal Reserve System, and the Federal Trade Commission, based on violations of the antitrust laws or unfair or deceptive acts, methods, or practices in commerce;

(2) Final orders of the National Labor Relations Board;

(3) Orders to cease and desist from violating section 1599 of title 7.

The Court of Appeals for the District of Columbia also has jurisdiction to review orders of the Post Office Department under section 576 of title 39 relating to discriminations in sending second-class publications by freight; Maritime Commission orders denying transfer to foreign registry of vessels under subsidy contract; sugar allotment orders; decisions of the Federal Communications Commission granting or refusing applications for construction permits for radio stations, or for radio station licenses, or for renewal or modification of radio station licenses, or suspending any radio operator's license.

Changes were made in phraseology.

UNITED STATES CODE SERVICE
Copyright © 2015 Matthew Bender & Company, Inc. a member of the LexisNexis Group ™ All rights reserved.

5

## 28 USCS § 1331

Current through PL 114-9, approved 4/7/15

*United States Code Service - Titles 1 through 54* > **TITLE 28. JUDICIARY AND JUDICIAL PROCEDURE** > **PART IV. JURISDICTION AND VENUE** > **CHAPTER 85. DISTRICT COURTS; JURISDICTION**

## Notice

 *Part 1 of 2.* You are viewing a very large document that has been divided into parts.

## § 1331. Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

## History

(June 25, 1948, ch 646,*62 Stat. 930*; July 25, 1958, *P.L. 85-554*, § 1, *72 Stat. 415*; Oct. 21, 1976, *P.L. 94-574*, § 2, *90 Stat. 2721*; Dec. 1, 1980, *P.L. 96-486*, § 2(a), *94 Stat. 2369*.)

**Prior law and revision:**

Based on *title 28, U.S.C., 1940 ed., § 41(1)* (Mar. 3, 1911, ch. 231, § 24, P 1, *36 Stat. 1091*; May 14, 1934, ch. 283, § 1, *48 Stat. 775*; Aug. 21, 1937, ch. 726, § 1, *50 Stat. 738*; Apr. 20, 1940, ch. 117, *54 Stat. 143*).

Jurisdiction of federal questions arising under other sections of this chapter is not dependent upon the amount in controversy. (See annotations under former *section 41 of title 28, U.S.C.A.*, and 35 C.J.S., p. 833 et seq., Sec. 30-43. See, also, reviser's note under section 1332 of this title.)

Words "wherein the matter in controversy exceeds the sum or value of $ 3,000, exclusive of interest and costs," were added to conform to rulings of the Supreme Court. See construction of provision relating to jurisdictional amount requirement in cases involving a Federal question in *United States v. Sayward, 16 S.Ct. 371, 160 U.S. 493, 40 L.Ed. 508; Fishback v. Western Union Tel. Co., 16 S.Ct. 506, 161 U.S. 96, 40 L.Ed. 630;* and *Halt v. Indiana Manufacturing Co., 1900, 20 S.Ct. 272, 176 U.S. 68, 44 L.Ed. 374.*

Words "all civil actions" were substituted for "all suits of a civil nature, at common law or in equity" to conform with *Rule 2 of the Federal Rules of Civil Procedure.*

Words "or treaties" were substituted for "or treaties made, or which shall be made under their authority," for purposes of brevity.

The remaining provisions of *section 41(1) of title 28, U.S.C.*, 1940 ed., are incorporated in sections 1332, 1341, 1342, 1345, 1354, and 1359 of this title.

Changes were made in arrangement and phraseology.

UNITED STATES CODE SERVICE

Copyright © 2015 Matthew Bender & Company, Inc. a member of the LexisNexis Group ™ All rights reserved.

6

## *28 USCS § 1346*

Current through PL 114-9, approved 4/7/15

*United States Code Service - Titles 1 through 54* > *TITLE 28. JUDICIARY AND JUDICIAL PROCEDURE* > *PART IV. JURISDICTION AND VENUE* > *CHAPTER 85. DISTRICT COURTS; JURISDICTION*

## Notice

 *Part 1 of 2.* You are viewing a very large document that has been divided into parts.

## § 1346. United States as defendant

(a)   The district courts shall have original jurisdiction, concurrent with the United States Claims Court [United States Court of Federal Claims], of:

   (1)   Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws;

   (2)   Any other civil action or claim against the United States, not exceeding $ 10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort, except that the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States or for liquidated or unliquidated damages in cases not sounding in tort which are subject to sections 7104(b)(1) and 7107(a)(1) of title 41. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

(b)

   (1)   Subject to the provisions of chapter 171 of this *title [28 USCS §§ 2671* et seq.], the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

   (2)   No person convicted of a felony who is incarcerated while awaiting sentencing or while serving a sentence may bring a civil action against the United States or an agency, officer, or employee of the Government, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of title 18).

(c)   The jurisdiction conferred by this section includes jurisdiction of any set-off, counterclaim, or other claim or demand whatever on the part of the United States against any plaintiff commencing an action under this section.

(d)   The district courts shall not have jurisdiction under this section of any civil action or claim for a pension.

(e)   The district courts shall have original jurisdiction of any civil action against the United States provided in section 6226, 6228(a), 7426, or 7428 [28 USCS § 6226, 6228(a), 7426, or 7428] (in the case of the United States district court for the District of Columbia) or *section 7429 of the Internal Revenue Code of 1954* [*26 USCS §§ 6226*, *6228(a)*, *7426*, *7428*, *7429*].

7

28 USCS § 1346

(f)  The district courts shall have exclusive original jurisdiction of civil actions under section 2409a [*28 USCS § 2409a*] to quiet title to an estate or interest in real property in which an interest is claimed by the United States.

(g)  Subject to the provisions of chapter 179 [*28 USCS §§ 3901* et seq.], the district courts of the United States shall have exclusive jurisdiction over any civil action commenced under section 453(2) of title 3, by a covered employee under chapter 5 of such *title [3 USCS §§ 401* et seq].

## History

(June 25, 1948, ch 646,*62 Stat. 933*; April 25, 1949, ch 92, § 2(a), *63 Stat. 62*; May 24, 1949, ch 139, § 80(a), (b), *63 Stat. 101*; Oct. 31, 1951, ch 655, § 50(b), *68 Stat. 727*; July 30, 1954, ch 648, § 1, *68 Stat. 589*; July 7, 1958, *P.L. 85-508*, § 12(e), *72 Stat. 348*; Aug. 30, 1964, *P.L. 88-519*, *78 Stat. 699*; Nov. 2, 1966, *P.L. 89-719*, Title II, § 202(a), *80 Stat. 1148*; July 23, 1970, *P.L. 91-350*, § 1(a), *84 Stat. 449*; Oct. 25, 1972, *P.L. 92-562*, § 1, *86 Stat. 1176*; Oct. 4, 1976, *P.L. 94-455*, Title XII, §§ 1204(c)(1), 1306(b)(7), *90 Stat. 1697*, 1719; Nov. 1, 1978, *P.L. 95-563*, § 14(a), *92 Stat. 2389*; April 2, 1982, *P.L. 97-164*, Title I, Part A, § 129, *96 Stat. 39*; Sept. 3, 1982, *P.L. 97-248*, Title IV, § 402(c)(17), *96 Stat. 669*; April 26, 1996, *P.L. 104-134*, Title I [Title VIII, § 806], *110 Stat. 1321*-75; May 2, 1996, *P.L. 104-140*, § 1(a), *110 Stat. 1327*; Oct. 26, 1996, *P.L. 104-331*, § 3(b)(1), *110 Stat. 4069*; Jan. 4, 2011, *P.L. 111-350*, § 5(g)(6), *124 Stat. 3848*.)

(As amended March 7, 2013,*P.L. 113-4*, Title XI, § 1101(b), *127 Stat. 134*.)

**Prior law and revision:**

1948 Act

Based on *title 28, U.S.C., 1940 ed., § 41(20)*, *931(a)*, *932* (Mar. 3, 1911, ch. 231, Sec. 24, par. 20, *36 Stat. 1093*; Nov. 23, 1921, ch. 136, § 1310(c), *42 Stat. 311*; June 2, 1924, ch. 234, § 1025(c), *43 Stat. 348*; Feb. 24, 1925, ch. 309, *43 Stat. 972*; Feb. 26, 1926, ch. 27, § 1122(c), 1200, *44 Stat. 121*, 125; Aug. 2, 1946, ch. 753, § 410(a), 411, *60 Stat. 843*).

Section consolidates provisions of section 41(20) conferring jurisdiction upon the district court, in civil actions against the United States, with the first sentence of section 931(a) relating to jurisdiction of the district courts in tort claims cases, and those provisions of section 932 making the provisions of said section 41(20), relating to counterclaim and set-off, applicable to tort claims cases, all of title 28, U.S.C., 1940 ed.

Provision in *section 931(a) of title 28, U.S.C.*, 1940 ed., for trials without a jury, is incorporated in section 2402 of this revised title. For other provisions thereof, see Distribution Table.

Words "commencing an action under this section" in subsec. (c) of this revised section cover the provision in *section 932 of title 28, U.S.C.*, 1940 ed., requiring that the same provisions "for counterclaim and set-off" shall apply to tort claims cases brought in the district courts.

The phrase in *section 931(a) of title 28, U.S.C.*, 1940 ed., "accruing on and after January 1, 1945" was omitted because executed as of the date of the enactment of this revised title.

Provisions in *section 41(20) of title 28, U.S.C.*, 1940 ed., relating to time for commencing action against United States and jury trial constitute sections 2401 and 2402 of this title. (See revisers' notes under said sections.)

Words in *section 41(20) of title 28, U.S.C.*, 1940 ed., "commenced after passage of the Revenue Act of 1921" were not included in revised subsection (a)(1) because obsolete and superfluous. Actions under this section involving erroneous or illegal assessments by the collector of taxes would be barred unless filed within the 5-year limitation period of section 1113(a) of the Revenue Act of 1926, *44 Stat. 9*, 116. (See *United States v. A. S. Kreider Co., 1941, 61 S.Ct. 1007, 313 U.S. 443, 85 L.Ed. 1447.*)

Words in *section 41(20) of title 28, U.S.C.*, 1940 ed., "if the collector of internal revenue is dead or is not in office at the time such action or proceeding is commenced" were omitted.

The revised section retains the language of *section 41(20) of title 28, U.S.C.*, 1940 ed., with respect to actions against the United States if the collector is dead or not in office when action is commenced, and consequently maintains the long existing distinctions in practice between actions against the United States and actions against the collector who made the assessment or collection. In the latter class of actions either party may demand a jury trial while jury trial is denied in actions against the United States. See section 2402 of this title. In reality all such actions are against the United States and not against local collectors. (See *Lowe v. United States, 1938, 58 S.Ct. 896, 304 U.S. 302, 82 L.Ed. 1362; Manseau v. United States, D.C.Mich. 1943, 52 F.Supp. 395,* and *Combined Metals Reduction Co. v. United States, D.C.Utah 1943, 53 F.Supp.*

8

28 USCS § 1346

*739.)*

The revised subsection (c)(1) omitted clause: "but no suit pending on the 27th day of June 1898 shall abate or be affected by this provision," contained in *section 41(20) of title 28, U.S.C.*, 1940 ed., as obsolete and superfluous. The words contained in *section 41(20) of title 28, U.S.C.*, 1940 ed., "claims growing out of the Civil War, and commonly known as 'war-claims,' or to hear and determine other claims which had been reported adversely prior to the 3d day of March 1887 by any court, department, or commission authorized to have and determine the same," were omitted for the same reason.

The words "in a civil action or in admiralty," in subsection (a)(2), were substituted for "either in a court of law, equity, or admiralty" to conform to *Rule 2 of the Federal Rules of Civil Procedure.*

Words in section 41(20) "in respect to which claims the party would be entitled to redress against the United States, either in a court of law, equity, or admiralty, if the United States were suable" were omitted from subsection (a)(2) of this revised section as unnecessary. See reviser's note under section 1491 of this title.

For jurisdiction of The Tax Court to review claims for refunds of processing taxes collected under the unconstitutional Agriculture Adjustment Act, see sections 644-659 of title 7, U.S.C., 1940 ed., Agriculture, and the 1942 Revenue Act, Act Oct. 21, 1942, ch. 610, title V, § 510(a), (c), (d), *56 Stat. 667*. (See, also, *Lamborn v. United States, C.C.P.A. 1939, 104 F.2d 75,* certiorari denied *60 S.Ct. 115, 308 U.S. 589, 84 L.Ed. 493.)*

See, also, reviser's note under section 1491 of this title as to jurisdiction of the Court of Claims in suits against the United States generally. For venue of actions under this section, see section 1402 of this title and reviser's note thereunder.

Minor changes were made in phraseology.

SENATE REVISION AMENDMENT

The provision of *title 28, U.S.C., § 932,* which related to application of the Federal Rules of Civil Procedure, were originally set out in section 2676 of this revised title, but such section 2676 was eliminated by Senate amendment. See 80th Congress Senate Report No. 1559, amendment No. 61.

1949 Act

This section corrects typographical errors in *section 1346(a)(1) of title 28, U.S.C.,* and in section 1346(b) of such title.

UNITED STATES CODE SERVICE

Copyright © 2015 Matthew Bender & Company, Inc. a member of the LexisNexis Group ™ All rights reserved.

## 28 USCS § 1391

Current through PL 114-9, approved 4/7/15

*United States Code Service - Titles 1 through 54* > **TITLE 28. JUDICIARY AND JUDICIAL PROCEDURE** > **PART IV. JURISDICTION AND VENUE** > **CHAPTER 87. DISTRICT COURTS; VENUE**

# § 1391. Venue generally

(a)  Applicability of section. Except as otherwise provided by law--

  (1)  this section shall govern the venue of all civil actions brought in district courts of the United States; and

  (2)  the proper venue for a civil action shall be determined without regard to whether the action is local or transitory in nature.

(b)  Venue in general. A civil action may be brought in--

  (1)  a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

  (2)  a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

  (3)  if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

(c)  Residency. For all venue purposes--

  (1)  a natural person, including an alien lawfully admitted for permanent residence in the United States, shall be deemed to reside in the judicial district in which that person is domiciled;

  (2)  an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question and, if a plaintiff, only in the judicial district in which it maintains its principal place of business; and

  (3)  a defendant not resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants.

(d)  Residency of corporations in States with multiple districts. For purposes of venue under this chapter, in a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State, and, if there is no such district, the corporation shall be deemed to reside in the district within which it has the most significant contacts.

(e)  Actions where defendant is officer or employee of the United States.

  (1)  In general. A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action. Additional persons may be joined as parties to any such action in accordance with the Federal Rules of Civil Procedure and with such other venue requirements as would be applicable if the United States or one of its officers, employees, or agencies were not a party.

  (2)  Service. The summons and complaint in such an action shall be served as provided by the Federal Rules of

28 USCS § 1391

Civil Procedure except that the delivery of the summons and complaint to the officer or agency as required by the rules may be made by certified mail beyond the territorial limits of the district in which the action is brought.

**(f)** Civil actions against a foreign state. A civil action against a foreign state as defined in section 1603(a) of this title [28 USCS § 1603(a)] may be brought--

**(1)** in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;

**(2)** in any judicial district in which the vessel or cargo of a foreign state is situated, if the claim is asserted under section 1605(b) of this title [28 USCS § 1605(b)];

**(3)** in any judicial district in which the agency or instrumentality is licensed to do business or is doing business, if the action is brought against an agency or instrumentality of a foreign state as defined in section 1603(b) of this title [28 USCS § 1603(b)]; or

**(4)** in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.

**(g)** Multiparty, multiforum litigation. A civil action in which jurisdiction of the district court is based upon section 1369 of this title [28 USCS § 1369] may be brought in any district in which any defendant resides or in which a substantial part of the accident giving rise to the action took place.

## History

(June 25, 1948, ch. 646, 62 Stat. 935; Oct. 5, 1962, P.L. 87-748, § 2, 76 Stat. 744; Dec. 23, 1963, P.L. 88-234, 77 Stat. 473; Nov. 2, 1966, P.L. 89-714, §§ 1, 2, 80 Stat. 1111; Oct. 21, 1976, P.L. 94-583, §§ 3, 5, 90 Stat. 2721, 2897; Nov. 19, 1988, P.L. 100-702, Title X, § 1013(a), 102 Stat. 4669; Dec. 1, 1990, P.L. 101-650, Title III, § 311, 104 Stat. 5114; Dec. 9, 1991, P.L. 102-198, § 3, 105 Stat. 1623; Oct. 29, 1992, P.L. 102-572, Title V, § 504, 106 Stat. 4513; Oct. 3, 1995, P.L. 104-34, § 1, 109 Stat. 293; Nov. 2, 2002, P.L. 107-273, Div C, Title I, Subtitle A, § 11020(b)(2), 116 Stat. 1827; Dec. 7, 2011, P.L. 112-63, Title II, § 202, 125 Stat. 763.)

**Prior law and revision:**

Based on title 28, U.S.C., 1940 ed., § 111, 112 (Mar. 3, 1911, ch. 231, § 50, 51, 36 Stat. 1101; Sept. 19, 1922, ch. 345, 42 Stat. 849; Mar. 4, 1925, ch. 526, § 1, 43 Stat. 1264; Apr. 16, 1936, ch. 230, 49 Stat. 1213).

Section consolidates section 111 of title 28, U.S.C., 1940 ed., with part of section 112 of such title.

The portion of section 112 of title 28, U.S.C., 1940 ed., relating to venue generally constitutes this section and the parts relating to arrest of the defendant, venue and process in stockholders' actions constitute sections 1401, 1693, and 1695 of this title.

Provision in section 111 of title 28, U.S.C., 1940 ed., that a district court may proceed as to parties before it although one or more defendants do not reside in the district, and that its judgment shall be without prejudice to such absent defendants, was omitted as covered by rule 19(b) of the Federal Rules of Civil Procedure.

Word "action" was substituted for "suit" in view of Rule 2 of the Federal Rules of Civil Procedure.

Word "reside" was substituted for "whereof he is an inhabitant" for clarity inasmuch as "inhabitant" and "resident" are synonymous. (See Ex parte Shaw, 1892, 12 S.Ct. 935, 145 U.S. 444, 36 L.Ed. 768; Standard Stoker Co., Inc. v. Lower, D.C., 1931, 46 F.2d 678; Edgewater Realty Co. v. Tennessee Coal, Iron & Railroad Co., D.C., 1943, 49 F.Supp. 807.)

Reference to "all plaintiffs" and "all defendants" were substituted for references to "the plaintiff" and "the defendant," in view of many decisions holding that the singular terms were used in a collective sense. (See Smith v. Lyon, 1890, 10 S.Ct. 303, 133 U.S. 315, 33 L.Ed. 635; Hooe v. Jamieson, 1897, 17 S.Ct. 596, 166 U.S. 395, 41 L.Ed. 1049; and Fetzer v. Livermore, D.C., 1926, 15 F.2d 462.)

In subsection (c), references to defendants "found" within a district or voluntarily appearing were omitted. The use of the word "found" made section 111 of title 28, U.S.C., 1940 ed., ambiguous. The argument that an action could be brought in the district where one defendant resided and a nonresident defendant was "found," was rejected in Camp v. Gress, 1919,

28 USCS § 1391

39 S.Ct. 478, 250 U.S. 308, 63 L.Ed. 997. However, this ambiguity will be obviated in the future by the omission of such reference.

Subsection (d) of this section is added to give statutory recognition to the weight of authority concerning a rule of venue as to which there has been a sharp conflict of decisions. (See Sandusky Foundry & Machine Co. v. DeLavand, 1918, D.C.Ohio, 251 F. 631, 632, and cases cited. See also Keating v. Pennsylvania Co., 1917, D.C.Ohio, 245 F. 155 and cases cited.)

Changes were made in phraseology.

UNITED STATES CODE SERVICE

Copyright © 2015 Matthew Bender & Company, Inc. a member of the LexisNexis Group ™ All rights reserved.

## 40 CFR 7.30

This document is current through the April 23, 2015 issue of the Federal Register

*Code of Federal Regulations* > *TITLE 40-- PROTECTION OF ENVIRONMENT* > *CHAPTER I-- ENVIRONMENTAL PROTECTION AGENCY* > *SUBCHAPTER A-- GENERAL* > *PART 7-- NONDISCRIMINATION IN PROGRAMS OR ACTIVITIES RECEIVING FEDERAL ASSISTANCE FROM THE ENVIRONMENTAL PROTECTION AGENCY* > *SUBPART B-- DISCRIMINATION PROHIBITED ON THE BASIS OF RACE, COLOR, NATIONAL ORIGIN OR SEX*

## § 7.30 General prohibition.

No person shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving EPA assistance on the basis of race, color, national origin, or on the basis of sex in any program or activity receiving EPA assistance under the Federal Water Pollution Control Act, as amended, including the Environmental Financing Act of 1972.

## Statutory Authority

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**

42 U.S.C. 2000d to 2000d-7 and 6101 et seq.; 29 U.S.C. 794; 33 U.S.C. 1251 nt.

## History

[49 FR 1659, Jan. 12, 1984]

**Annotations**

## Research References & Practice Aids

**NOTES APPLICABLE TO ENTIRE CHAPTER:**

[PUBLISHER'S NOTE: Nomenclature changes to Chapter I appear at 65 FR 47323, 47324, 47325, Aug. 2, 2000.]

[PUBLISHER'S NOTE: For Federal Register citations concerning Chapter 1 Notice of implementation policy, see: 71 FR 25504, May 1, 2006.]

[PUBLISHER'S NOTE: For Federal Register citations concerning Chapter 1 Findings, see: 74 FR 66496, Dec. 15, 2009.]

[PUBLISHER'S NOTE: For Federal Register citations concerning Chapter I Denials, see: 75 FR 49556, Aug. 13, 2010; 77 FR 42181, July 18, 2012.]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS

Copyright © 2015, by Matthew Bender & Company, a member of the LexisNexis Group. All rights reserved.

# 40 CFR 7.35

This document is current through the April 23, 2015 issue of the Federal Register

*Code of Federal Regulations > TITLE 40-- PROTECTION OF ENVIRONMENT > CHAPTER I-- ENVIRONMENTAL PROTECTION AGENCY > SUBCHAPTER A-- GENERAL > PART 7-- NONDISCRIMINATION IN PROGRAMS OR ACTIVITIES RECEIVING FEDERAL ASSISTANCE FROM THE ENVIRONMENTAL PROTECTION AGENCY > SUBPART B-- DISCRIMINATION PROHIBITED ON THE BASIS OF RACE, COLOR, NATIONAL ORIGIN OR SEX*

## § 7.35 Specific prohibitions.

(a)   As to any program or activity receiving EPA assistance, a recipient shall not directly or through contractual, licensing, or other arrangements on the basis of race, color, national origin or, if applicable, sex:

(1)   Deny a person any service, aid or other benefit of the program or activity;

(2)   Provide a person any service, aid or other benefit that is different, or is provided differently from that provided to others under the program or activity;

(3)   Restrict a person in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, aid, or benefit provided by the program or activity;

(4)   Subject a person to segregation in any manner or separate treatment in any way related to receiving services or benefits under the program or activity;

(5)   Deny a person or any group of persons the opportunity to participate as members of any planning or advisory body which is an integral part of the program or activity, such as a local sanitation board or sewer authority;

(6)   Discriminate in employment on the basis of sex in any program or activity subject to section 13, or on the basis of race, color, or national origin in any program whose purpose is to create employment; or, by means of employment discrimination, deny intended beneficiaries the benefits of EPA assistance, or subject the beneficiaries to prohibited discrimination.

(7)   In administering a program or activity receiving Federal financial assistance in which the recipient has previously discriminated on the basis of race, color, sex, or national origin, the recipient shall take affirmative action to provide remedies to those who have been injured by the discrimination.

(b)   A recipient shall not use criteria or methods of administering its program or activity which have the effect of subjecting individuals to discrimination because of their race, color, national origin, or sex, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program or activity with respect to individuals of a particular race, color, national origin, or sex.

(c)   A recipient shall not choose a site or location of a facility that has the purpose or effect of excluding individuals from, denying them the benefits of, or subjecting them to discrimination under any program or activity to which this part applies on the grounds of race, color, or national origin or sex; or with the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of this subpart.

(d)   The specific prohibitions of discrimination enumerated above do not limit the general prohibition of § 7.30.

## Statutory Authority

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**

42 U.S.C. 2000d to 2000d-7 and 6101 et seq.; 29 U.S.C. 794; 33 U.S.C. 1251 nt.

14

## 40 CFR 7.115

This document is current through the April 23, 2015 issue of the Federal Register

*Code of Federal Regulations* > *TITLE 40-- PROTECTION OF ENVIRONMENT* > *CHAPTER I-- ENVIRONMENTAL PROTECTION AGENCY* > *SUBCHAPTER A-- GENERAL* > *PART 7-- NONDISCRIMINATION IN PROGRAMS OR ACTIVITIES RECEIVING FEDERAL ASSISTANCE FROM THE ENVIRONMENTAL PROTECTION AGENCY* > *SUBPART E-- AGENCY COMPLIANCE PROCEDURES*

## § 7.115 Postaward compliance.

**(a)** Periodic review. The OCR may periodically conduct compliance reviews of any recipient's programs or activities receiving EPA assistance, including the request of data and information, and may conduct on-site reviews when it has reason to believe that discrimination may be occurring in such programs or activities.

**(b)** Notice of review. After selecting a recipient for review or initiating a complaint investigation in accordance with § 7.120, the OCR will inform the recipient of:

**(1)** The nature of and schedule for review, or investigation; and

**(2)** Its opportunity, before the determination in paragraph (d) of this section is made, to make a written submission responding to, rebutting, or denying the allegations raised in the review or complaint.

**(c)** Postreview notice. (1) Within 180 calendar days from the start of the compliance review or complaint investigation, the OCR will notify the recipient in writing by certified mail, return receipt requested, of:

**(i)** Preliminary findings;

**(ii)** Recommendations, if any, for achieving voluntary compliance; and

**(iii)** Recipient's right to engage in voluntary compliance negotiations where appropriate.

**(2)** The OCR will notify the Award Official and the Assistant Attorney General for Civil Rights of the preliminary findings of noncompliance.

**(d)** Formal determination of noncompliance. After receiving the notice of the preliminary finding of noncompliance in paragraph (c) of this section, the recipient may:

**(1)** Agree to the OCR's recommendations, or

**(2)** Submit a written response sufficient to demonstrate that the preliminary findings are incorrect, or that compliance may be achieved through steps other than those recommended by OCR.

If the recipient does not take one of these actions within fifty (50) calendar days after receiving this preliminary notice, the OCR shall, within fourteen (14) calendar days, send a formal written determination of noncompliance to the recipient and copies to the Award Official and Assistant Attorney General.

**(e)** Voluntary compliance time limits. The recipient will have ten (10) calendar days from receipt of the formal determination of noncompliance in which to come into voluntary compliance. If the recipient fails to meet this deadline, the OCR must start proceedings under paragraph (b) of § 7.130.

**(f)** Form of voluntary compliance agreements. All agreements to come into voluntary compliance must:

**(1)** Be in writing;

**(2)** Set forth the specific steps the recipient has agreed to take, and

**(3)** Be signed by the Director, OCR or his/her designee and an official with authority to legally bind the recipient.

15

## 40 CFR 7.120

This document is current through the April 23, 2015 issue of the Federal Register

*Code of Federal Regulations* > *TITLE 40-- PROTECTION OF ENVIRONMENT* > *CHAPTER I-- ENVIRONMENTAL PROTECTION AGENCY* > *SUBCHAPTER A-- GENERAL* > *PART 7-- NONDISCRIMINATION IN PROGRAMS OR ACTIVITIES RECEIVING FEDERAL ASSISTANCE FROM THE ENVIRONMENTAL PROTECTION AGENCY* > *SUBPART E-- AGENCY COMPLIANCE PROCEDURES*

# § 7.120 Complaint investigations.

The OCR shall promptly investigate all complaints filed under this section unless the complainant and the party complained against agree to a delay pending settlement negotiations.

(a) Who may file a complaint. A person who believes that he or she or a specific class of persons has been discriminated against in violation of this part may file a complaint. The complaint may be filed by an authorized representative. A complaint alleging employment discrimination must identify at least one individual aggrieved by such discrimination. Complaints solely alleging employment discrimination against an individual on the basis of race, color, national origin, sex or religion shall be processed under the procedures for complaints of employment discrimination filed against recipients of federal assistance (see 28 CFR part 42, subpart H and 29 CFR part 1691). Complaints of employment discrimination based on age against an individual by recipients of Federal financial assistance are subject to the Age Discrimination in Employment Act of 1967 and should be filed administratively with the Equal Employment Opportunity Commission (See 29 CFR part 1626). Complainants are encouraged but not required to make use of any grievance procedure established under § 7.90 before filing a complaint. Filing a complaint through a grievance procedure does not extend the 180 day calendar requirement of paragraph (b)(2 of this section.

(b) Where, when and how to file complaint. The complainant may file a complaint at any EPA office. The complaint may be referred to the region in which the alleged discriminatory acts occurred.

  (1) The complaint must be in writing and it must describe the alleged discriminatory acts which violate this part.

  (2) The complaint must be filed within 180 calendar days of the alleged discriminatory acts, unless the OCR waives the time limit for good cause. The filing of a grievance with the recipient does not satisfy the requirement that complaints must be filed within 180 days of the alleged discriminatory acts.

(c) Notification. The OCR will notify the complainant and the recipient of the agency's receipt of the complaint within five (5) calendar days.

(d) Complaint processing procedures. After acknowledging receipt of a complaint, the OCR will immediately initiate complaint processing procedures.

  (1) Preliminary investigation (i) Within twenty (20) calendar days of acknowledgment of the complaint, the OCR will review the complaint for acceptance, rejection, or referral to the appropriate Federal agency.

    (ii) If the complaint is accepted, the OCR will notify the complainant and the Award Official. The OCR will also notify the applicant or recipient complained against of the allegations and give the applicant or recipient opportunity to make a written submission responding to, rebutting, or denying the allegations raised in the complaint.

    (iii) The party complained against may send the OCR a response to the notice of complaint within thirty (30) calendar days of receiving it.

    (iv) Complaints alleging age discrimination under the Age Discrimination Act of 1975 will be referred to a mediation agency in accordance with § 7.180.

  (2) Informal resolution. (i) OCR shall attempt to resolve complaints informally whenever possible. When a

complaint cannot be resolved informally, OCR shall follow the procedures established by paragraphs (c) through (e) of § 7.115.

**(e)** Confidentiality. EPA agrees to keep the complainant's identity confidential except to the extent necessary to carry out the purposes of this part, including the conduct of any investigation, hearing, or judicial proceeding arising thereunder. Ordinarily in complaints of employment discrimination, the name of the complainant will be given to the recipient with the notice of complaint.

**(f)** [Reserved]

**(g)** Dismissal of complaint. If OCR's investigation reveals no violation of this part, the Director, OCR, will dismiss the complaint and notify the complainant and recipient.

## Statutory Authority

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**

42 U.S.C. 2000d to 2000d-7 and 6101 et seq.; 29 U.S.C. 794; 33 U.S.C. 1251nt.

## History

[49 FR 1659, Jan. 12, 1984; *75 FR 31702, 31707,* June 4, 2010]

**Annotations**

## Notes

[**EFFECTIVE DATE NOTE:**

*75 FR 31702, 31707,* June 4, 2010, amended paragraph (a) and added paragraph (d)(1)(iv), effective Oct. 4, 2010.]

## Case Notes

**LexisNexis® Notes**

**Case Notes Applicable to Entire Part**

*Part Note*

Rosemere Neighborhood Ass'n v. United States EPA, 581 F.3d 1169, 2009 U.S. App. LEXIS 20668 (9th Cir Sept. 17, 2009).

*Overview: Where the relief sought was an order to the EPA to "hurry up," but EPA acted to moot the case by acting before the claim for relief could be decided, such a sequence was an exception to the ordinary rules of mootness, and association's complaint against the EPA was not moot.*

- According to the regulations governing the Environmental Protection Agency's Office of Civil Rights (OCR), any party may file a complaint alleging discrimination which the OCR will review for acceptance or rejection within 20 days. 40 C.F.R. § 7.120(d)(1)(i). If the OCR accepts the complaint, it shall issue preliminary findings within 180 days of the beginning of the complaint investigation. 40 C.F.R. § 7.115(c)(1). Go To Headnote

### 40 CFR 7.130

This document is current through the April 23, 2015 issue of the Federal Register

*Code of Federal Regulations* > *TITLE 40-- PROTECTION OF ENVIRONMENT* > *CHAPTER I-- ENVIRONMENTAL PROTECTION AGENCY* > *SUBCHAPTER A-- GENERAL* > *PART 7-- NONDISCRIMINATION IN PROGRAMS OR ACTIVITIES RECEIVING FEDERAL ASSISTANCE FROM THE ENVIRONMENTAL PROTECTION AGENCY* > *SUBPART E-- AGENCY COMPLIANCE PROCEDURES*

## § 7.130 Actions available to EPA to obtain compliance.

**(a)** General. If compliance with this part cannot be assured by informal means, EPA may terminate or refuse to award or to continue assistance. EPA may also use any other means authorized by law to get compliance, including a referral of the matter to the Department of Justice.

**(b)** **Procedure to deny, annul, suspend or terminate EPA assistance --**

**(1)** OCR finding. If OCR determines that an applicant or recipient is not in compliance with this part, and if compliance cannot be achieved voluntarily, OCR shall make a finding of noncompliance. The OCR will notify the applicant or recipient (by registered mail, return receipt requested) of the finding, the action proposed to be taken, and the opportunity for an evidentiary hearing.

**(2)** **Hearing.**

**(i)** Within 30 days of receipt of the above notice, the applicant or recipient shall file a written answer, under oath or affirmation, and may request a hearing.

**(ii)** The answer and request for a hearing shall be sent by registered mail, return receipt requested, to the Chief Administrative Law Judge (ALJ) (A-110), United States Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460. Upon receipt of a request for a hearing, the ALJ will send the applicant or recipient a copy of the ALJ's procedures. If the recipient does not request a hearing, it shall be deemed to have waived its right to a hearing, and the OCR finding shall be deemed to be the ALJ's determination.

**(3)** **Final decision and disposition.**

**(i)** The applicant or recipient may, within 30 days of receipt of the ALJ's determination, file with the Administrator its exceptions to that determination. When such exceptions are filed, the Administrator may, within 45 days after the ALJ's determination, serve to the applicant or recipient, a notice that he/she will review the determination. In the absence of either exceptions or notice of review, the ALJ's determination shall constitute the Administrator's final decision.

**(ii)** If the Administrator reviews the ALJ's determination, all parties shall be given reasonable opportunity to file written statements. A copy of the Administrator's decision will be sent to the applicant or recipient.

**(iii)** If the Administrator's decision is to deny an application, or annul, suspend or terminate EPA assistance, that decision becomes effective thirty (30) days from the date on which the Administrator submits a full written report of the circumstances and grounds for such action to the Committees of the House and Senate having legislative jurisdiction over the program or activity involved. The decision of the Administrator shall not be subject to further administrative appeal under EPA's General Regulation for Assistance Programs (40 CFR part 30, subpart L).

**(4)** Scope of decision. The denial, annulment, termination or suspension shall be limited to the particular applicant or recipient who was found to have discriminated, and shall be limited in its effect to the particular program or activity or the part of it in which the discrimination was found.

## 42 USCS § 2000d

Current through PL 114-9, approved 4/7/15

_United States Code Service - Titles 1 through 54_ > _TITLE 42. THE PUBLIC HEALTH AND WELFARE_ > _CHAPTER 21. CIVIL RIGHTS_ > _FEDERALLY ASSISTED PROGRAMS_

## § 2000d. Prohibition against exclusion from participation in, denial of benefits of, and discrimination under federally assisted programs on ground of race, color, or national origin

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

## History

(July 2, 1964, P.L. 88-352, Title VI, § 601, 78 Stat. 252.)

UNITED STATES CODE SERVICE

Copyright © 2015 Matthew Bender & Company, Inc. a member of the LexisNexis Group ™ All rights reserved.

19

## 42 USCS § 2000d-1

Current through PL 114-9, approved 4/7/15

*United States Code Service - Titles 1 through 54* > *TITLE 42. THE PUBLIC HEALTH AND WELFARE* > *CHAPTER 21. CIVIL RIGHTS* > *FEDERALLY ASSISTED PROGRAMS*

## § 2000d-1. Federal authority and financial assistance to programs or activities by way of grant, loan, or contract other than contract of insurance or guaranty; rules and regulations; approval by President; compliance with requirements; reports to Congressional committees; effective date of administrative action

Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 601 [42 USCS § 2000d] with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

## History

(July 2, 1964, P.L. 88-352, Title VI, § 602, 78 Stat. 252.)

UNITED STATES CODE SERVICE

Copyright © 2015 Matthew Bender & Company, Inc. a member of the LexisNexis Group ™ All rights reserved.

20

## 42 USCS § 2000d-2

Current through PL 114-9, approved 4/7/15

*United States Code Service - Titles 1 through 54* > *TITLE 42. THE PUBLIC HEALTH AND WELFARE* > *CHAPTER 21. CIVIL RIGHTS* > *FEDERALLY ASSISTED PROGRAMS*

## § 2000d-2. Judicial review; administrative procedure provisions

Any department or agency action taken pursuant to section 602 [42 USCS § 2000d-1], shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds. In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 602 [42 USCS § 2000d-1], any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with section 10 of the Administrative Procedure Act [*5 USCS §§ 701* et seq.], and such action shall not be deemed committed to unreviewable agency discretion within the meaning of that section [*5 USCS §§ 701* et seq.].

## History

(July 2, 1964, P.L. 88-352, Title VI, § 603, 78 Stat. 253.)

UNITED STATES CODE SERVICE

Copyright © 2015 Matthew Bender & Company, Inc. a member of the LexisNexis Group ™ All rights reserved.

21

## Cal Food & Agr Code § 14009

This document is current for urgency legislation through Chapter 2 of the 2015 Session

*Deering's California Code Annotated* > *FOOD AND AGRICULTURAL CODE* > *Division 7. Agricultural Chemicals, Livestock Remedies, and Commercial Feeds* > *Chapter 3. Restricted Materials* > *Article 1. Generally*

# § 14009. Review of action involving permit; Decision by commissioner; Appeal; Notice; Judicial review

(a)  Any interested person may request the commissioner to review his or her action in issuing, refusing, revoking, suspending, or conditioning a permit to use or possess a restricted material. The commissioner shall review the request and issue a written decision in response to the request to review within 10 days of receipt of the request, or as soon as practicable. The commissioner may affirm, modify, or cancel the permit action reviewed. A directly affected person may thereafter appeal to the director to review the commissioner's action.

(b)  The commissioner and director shall conduct each review in an expeditious manner so that needed pest control measures are not adversely affected.

(c)  Each request for review shall be submitted in writing to the commissioner by the person requesting the review and shall include all of the following:

(1)  The location of persons, property, or areas that would be affected and the location of property to be treated.

(2)  The name of the restricted material involved.

(3)  The name and address of the person in charge of the property to be treated, if different from the person filing the request for review.

(4)  Any other information that the person filing the request for review or the commissioner determines to be relevant.

(d)  In an appeal of a commissioner's action to the director, the issues are limited to any of the following:

(1)  Whether the proposed permit use is consistent with applicable pesticide label restrictions and applicable regulations.

(2)  Whether the commissioner properly considered the provisions of Section 14006.5.

(3)  Whether the commissioner abused his or her discretion in issuing, refusing, revoking, or conditioning the permit.

(e)  The director shall act on these appeals within 10 days of receipt thereof or as soon thereafter as is practicable. The director may stay the operation of a permit until his or her review is complete.

(f)

(1)  Prior to conducting a public review, the director shall notify directly affected persons at least 72 hours in advance of the location and time of the public review.

(2)  Before acting on an appeal, the director shall, in a specified location open to the public, review the information provided to him or her as specified in this section if requested to do so in writing by any interested person.

(3)  The director may request additional testimony or other evidence specified in this section at the public review from interested persons.

(g)  Judicial review of any decision by the director pursuant to this section shall be pursuant to Section 1094.5 of the Code of Civil Procedure. Review shall be limited to whether the proposed permit use is consistent with applicable pesticide label restrictions and regulations and whether the director abused his or her discretion.

Cal Food & Agr Code § 14009

## History

Enacted Stats 1967 ch 15 § 2. Amended Stats 1979 ch 660 § 10; Stats 1982 ch 982 § 8; Stats 1984 ch 1145 § 1; Stats 1996 ch 435 § 9 (SB 802).

**Former Sections:**
There was another section of this number, which was added Stats 1979 ch 660 § 11, to become operative January 1, 1983, and repealed Stats 1982 ch 982 § 9.

**Historical Derivation:**
Former Ag C § 1080.2, as added Stats 1953 ch 749 § 3.

Deering's California Codes Annotated

Copyright © 2015 by Matthew Bender & Company, Inc. a member of the LexisNexis Group. All rights reserved.